**IN THE UNITED STATES DISTRICT COURT FOR**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **U.S. HEALTHTEK, INC.,** | |
| *PLAINTIFF,* | |
| | **Civil Action No. _____** |
| **v.** | |
| **ROBERT NEGOSIAN,** | |
| **KIRANMAYEE DIGAVINTI, and** | |
| **ACM GLOBAL LABORATORIES,** | |
| *DEFENDANTS.* | |

Plaintiff U.S. HealthTek, Inc. ("U.S. HealthTek"), by counsel, states the following for its Complaint:

## NATURE OF CLAIM

1.      Defendants Robert Negosian ("Negosian"), Kiranmayee "Kiran" Digavinti ("Digavinti"), and ACM Global Laboratories ("ACM" or "ACM Global") have unlawfully engaged in concerted actions to obtain U.S. HealthTek's trade secrets and confidential information, and they have intentionally used this information to benefit themselves and to cause harm to U.S. HealthTek.

2.      Negosian and Digavinti, former employees of U.S. HealthTek, covertly laid the groundwork for Rasck Consulting, Inc., a competing company, while they were employed with U.S. HealthTek; and after leaving U.S. HealthTek, they continued to build Rasck Consulting using U.S. HealthTek's confidential information. In doing so, Negosian and Digavinti flagrantly violated the terms of valid and enforceable agreements into which they entered with U.S. HealthTek.

3.      In the course of Negosian's and Digavinti's scheme to benefit themselves at the expense of U.S. HealthTek, they successfully poached ACM Global, one of U.S. HealthTek's most valuable clients, in violation of their employment agreements. Negosian and Digavinti did so using U.S. HealthTek's trade secrets, without which they could not have performed the services they provided to ACM after ACM terminated its contract with U.S. HealthTek. This was not lost on ACM, which intentionally violated its own agreements with U.S. HealthTek by using the services of Negosian, Digavinti, and at least one other former U.S. HealthTek employee, all the while knowing these former employees would use their unique knowledge of U.S. HealthTek's confidential information to do the work.

4.      Defendants' attempt to bypass the legitimate avenues by which businesses normally engage in software development in this field is wrongful, and U.S. HealthTek seeks relief from this Court to address Defendants' actions.

## PARTIES

5.      U.S. HealthTek is a company incorporated in the Commonwealth of Virginia having its principal place of business in Haymarket, Virginia. U.S. HealthTek serves clients across the United States. It provides healthcare industry partners with information technology support in project management, custom software creation, and virtual staffing. The company's expertise includes optimization, upgrading, and maintenance of digital systems for healthcare organizations.

6.      With more than two decades' experience in the industry, U.S. HealthTek has made substantial investments in generating goodwill and in building valuable confidential business information, which includes private client data, proprietary application software development, and cloud interface data.

7.     U.S. HealthTek is part of a highly competitive industry, and it therefore takes reasonable measures to protect its investment in goodwill and client relationships, including requiring certain employees to sign agreements containing narrowly drawn noncompetition, nonsolicitation, and confidentiality obligations.

8.     Negosian is a citizen and resident of the State of California. He regularly conducts business in Virginia and is a former employee of U.S. HealthTek. He entered into various agreements with U.S. HealthTek containing noncompetition, nonsolicitation, and confidentiality obligations.

9.     Digavinti is an Indian citizen and resident of the United Kingdom who regularly conducts business in Virginia, and she previously served as Lead Software Engineer for U.S. HealthTek pursuant to an agreement that contained nonsolicitation and confidentiality obligations.

10.     U.S. HealthTek takes reasonable measures to protect its investment in goodwill and employee relationships, including requiring certain clients like ACM Global to enter into Consulting Services Agreements that include a nonsolicitation clause limiting the client's activities with U.S. HealthTek's employees.

11.     ACM Global is a company incorporated in the State of Delaware and having its principal place of business in the State of New York. ACM Global wholly owns DrugScan, Inc. (DrugScan) and DSI Medical, Inc (DSI). DrugScan and DSI are Delaware corporations, with each having its principal place of business in the Commonwealth of Pennsylvania. For several years, ACM has regularly conducted business with U.S. HealthTek through DrugScan and DSI, and this business relationship was most recently governed by a Consulting Services Agreement, into which ACM and U.S. HealthTek entered on January 1, 2022.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action and over Defendants pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and the matter is between citizens of different states.

13. Venue is appropriate in this Court under 28 U.S.C. § 1391 because U.S. HealthTek is incorporated in Prince William County, Virginia, and a substantial part of the events giving rise to this action occurred in this District. Further, Negosian has "expressly consent[ed] to personal jurisdiction and venue in the state and federal courts having jurisdiction over Prince William County, Virginia," for the purposes of any dispute involving the enforcement of his Employee Confidential Information and Inventions Agreement. *See* Ex. A at 6, ¶ 8.1. Digavinti has also expressly consented to the jurisdiction of federal courts sitting in Prince William County, Virginia, "for all matters and actions arising under" her Independent Contractor Agreement. *See* Ex. B at 5, ¶ 5.4.

## FACTS RELEVANT TO ALL COUNTS

14. For over two decades, U.S. HealthTek has served the healthcare industry by providing lab-focused information technology support.

15. U.S. HealthTek's services and products include, among other things, construction of highly sophisticated customized tools for clients, lab data management and translation, continuous management of clients' computer networks to ensure maximum functionality, system migration tools, and secure file transfer and messaging services.

16. U.S. HealthTek provides software to facilitate customer relations management, and it offers high-level insights into the functionality of its clients' data systems while making it easier for clients to track data, issues, and resolutions.

17.     In an aggressively competitive field, U.S. HealthTek's success is due to three main factors: (a) years of work in refining its methods, software, algorithms, databases, processes, troubleshooting procedures, technical data, and business plans; (b) employees in whom U.S. HealthTek has invested countless hours of training in various technical aspects of providing information technology solutions to clients' complex business needs; and (c) the trust they have developed with customers over the years, who have come to expect excellent products and service from U.S. HealthTek.

### U.S. HealthTek's Relationship with Negosian, Digavinti, and ACM Global

18.     Negosian joined U.S. HealthTek in 2012 when it operated under a different name; and in 2013, Negosian became a minority shareholder of U.S. HealthTek and was named chief operating officer. In 2023, Chief Executive Officer Cristy Reiter promoted Negosian to the role of president.

19.     In 2019, U.S. HealthTek hired Keri Thomson, Negosian's wife, to serve as assistant to CEO Reiter.

20.     In Negosian's roles as chief operating officer and president of U.S. HealthTek, he had regular and substantial contact with U.S. HealthTek clients and prospective clients, including ACM Global, due to the fact that he and CEO Reiter both served as the faces of U.S. HealthTek.

21.     ACM Global is a company specializing in clinical trial testing services, and it is the parent company of Drug Scan and DSI.

22.     Around 2014, U.S. HealthTek began contracting with DSI and continued working with DSI in 2018 after DSI and DrugScan were acquired by ACM Global. Over the following years, U.S. HealthTek contracted with ACM to perform work on well over a dozen significant projects that resulted in millions of dollars of revenue for U.S. HealthTek.

23.     Digavinti joined U.S. HealthTek in 2017 and initially served as a developer consultant who supported and serviced U.S. HealthTek's software applications.

24.     Over time, Digavinti grew in skill and was promoted to lead software engineer. She also began helping Negosian design and build the software systems that are one of the hallmarks of U.S. HealthTek's service packages, including U.S. HealthTek's OnePortal system.

25.     ACM Global was pleased with the results of the OnePortal system and the positive impact it had on the business of DSI and DrugScan. In 2022, ACM decided that it wanted an enhanced version of the OnePortal system, but ACM Chief Information Officer Robert "Bob" Diamond hired a third party to try to provide a similar system that would have the enhancements AMC wanted. After one year of attempting to work with the third party's inferior product, Diamond contacted U.S. HealthTek in 2023 and asked if it would be willing to do the work of taking OnePortal to the next level. U.S. HealthTek agreed, and the project that grew out of that agreement became known as the Enhanced OnePortal Project.

26.     In December 2023, U.S. HealthTek received an extension to complete the Enhanced OnePortal Project, and Digavinti agreed that she would continue working with U.S. HealthTek at least until the completion of the project in December 2024.

27.     In 2024, U.S. HealthTek and ACM Global memorialized their agreement with respect to the Enhanced OnePortal Project using various Statements of Work.

28.     There were six U.S. HealthTek team members assigned to complete the Enhanced OnePortal Project for ACM Global, including the project's co-leaders: Business Analyst Barbara Breeden and Digavinti, both of whom had expertise upon which Negosian was highly reliant to complete the project. Digavinti's assistance with the Enhanced OnePortal Project was essential because of her unique depth of knowledge of the product and its code.

*U.S. HealthTek's Trade Secrets*

29.     Creating software support systems like the Enhanced OnePortal Project requires a highly complex and technical process, and the number of companies in the world who do this type of work is limited. The knowledge U.S. HealthTek has developed for OnePortal and Enhanced OnePortal is specialized and the result of more than a decade of extensive research and development. Such information includes exact combinations of processes needed to use U.S. HealthTek software correctly—processes that U.S. HealthTek is able to modify to address specific needs of individual customers like ACM Global. U.S. HealthTek derives independent economic value from this information being kept secret because, if it is disclosed, it creates an unfair economic advantage both to competitors and to customers.

30.     U.S. HealthTek's information about its software, including the Enhanced OnePortal software, is confidential, proprietary, and constitutes trade secrets within the meaning of Virginia's Uniform Trade Secrets Act.

31.     U.S. HealthTek takes reasonable measures to protect its trade secrets and confidential information. Among other things, U.S. HealthTek requires certain employees to sign confidentiality agreements, examples of which can be found in Exhibits A and B.

32.     To further maintain the confidentiality of its information about the Enhanced OnePortal Project and other U.S. HealthTek products, U.S. HealthTek employs aggressive physical and computer network security protective measures that are defined in its Secure Development Policy, Risk Management Policy, Operations Security Policy, Data Management Policy, Third-Party Management Policy, and Access Control Policy. Ex. D.

*Negosian's Relevant Contractual Obligations to U.S. HealthTek*

33.    Negosian entered valid and enforceable agreements during his tenure at U.S. HealthTek, including an Employee Confidential Information and Inventions Agreement, which he signed on March 4, 2021. Ex. A.

34.    Pursuant to Negosian's Employee Confidential Information and Inventions Agreement, he agreed to the following valid and enforceable restrictive covenant governing inventions:

> "I hereby assign and agree to assign in the future (when any such Inventions or Intellectual Property Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, reduced to practice, or learned by me, either alone or with others, during the period of my employment by Company."

Ex. A at 3–4, ¶ 2.3.

35.    Pursuant to Negosian's Employee Confidential Information and Inventions Agreement, he agreed to the following valid and enforceable restrictive covenants governing confidentiality:

a.    "At all times during and after [his] employment," Negosian was prohibited from disclosing or using without the permission of U.S. HealthTek's chief executive officer any of the company's "Confidential Information," defined as follows:

> "any and all confidential or proprietary knowledge, data or information related to Company's business or its actual or demonstrably anticipated research or development, including without limitation (a) trade secrets, inventions, ideas, processes, computer source and object code, data, formulae, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques; (b) information regarding products, services, plans for research and development, marketing and

business plans, budgets, financial statements, contracts, prices, suppliers, and customers; (c) information regarding the skills and compensation of Company's employees, contractors, and any other service providers of Company; (d) the existence of any business discussions, negotiations, or agreements between Company and any third party; and (e) all . . . confidential and proprietary information"

received from third parties. Ex. A at 2–3, ¶¶ 1.1–1.3.

b. After termination of employment, Negosian was required to "deliver to the Company all of the Company's property, equipment, and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information, and Confidential Information" and to certify in writing that he fully complied with the obligation; and he was prohibited from copying, deleting, or altering any information in his U.S. Healthtek computer before returning it to the company. Ex. A at 5, ¶ 5.

c. After termination of employment, Negosian was required to provide U.S. HealthTek with "a computer-usable copy" of all Confidential Information that he maintained on any "personal computer, server, or e-mail system . . . and then to permanently delete and expunge such Confidential Information from those systems." Ex. A at 5, ¶ 5.

36.    In Negosian's Employee Confidential Information and Inventions Agreement, he agreed to the following valid and enforceable restrictive covenants governing noncompetition, nonsolicitation, and noninterference:

d. While employed by U.S. HealthTek, Negosian was prohibited from engaging "in any employment or business activity that is competitive with, or would otherwise

conflict with [his] employment by, the Company" without U.S. HealthTek's written consent. Ex. A at 5, ¶ 4(a).

e.   While employed by U.S. HealthTek and for one year after termination of employment, Negosian was prohibited from "directly or indirectly, solicit[ing] or attempt[ing] to solicit any employee, independent contractor, or consultant of Company to terminate his, her or its relationship with Company in order to become an employee, consultant, or independent contractor to or for any other person or entity." Ex. A at 5, ¶ 4(b).

f.   While employed by U.S. HealthTek and for one year after termination of employment, Negosian was prohibited from "either directly or indirectly, either for [himself] or for any other person or entity, induc[ing] or attempt[ing] to induce any customer, of Company to cease doing business with Company, or in any way interfer[ing] with the relationship between any customer of Company." Ex. A at 5, ¶ 4(c).

37.   In the Employee Confidential Information and Inventions Agreement, Negosian acknowledged that, because of the unique nature of his services to U.S. HealthTek, any breach would cause irreparable harm to U.S. HealthTek for which monetary damages would not be an adequate remedy, and U.S. HealthTek was, therefore, entitled to injunctive relief in the event Negosian breached the agreement. Ex. A at 7, ¶ 8.6. Negosian also agreed that any waiver or failure to enforce any provision of the Agreement on one occasion would not be deemed a waiver of the provision on future occasions. Ex. A at 7, ¶ 8.7.

*Negosian's Non-Contractual Obligations to U.S. HealthTek*

38.     During Negosian's employment with U.S. HealthTek, he owed a duty of loyalty to U.S. HealthTek.

39.     As a result of Negosian's duty of loyalty to U.S. HealthTek, she was barred from acting disloyally and was required to act in accordance with U.S. HealthTek's best interests at all times during his employment with U.S. HealthTek.

40.     Negosian's common law duty of loyalty prohibited him from diverting business away from U.S. HealthTek while he was employed with U.S. HealthTek.

*Digavinti's Relevant Contractual Obligations to U.S. HealthTek*

41.     Digavinti entered a valid and enforceable Independent Contractor Agreement with U.S. HealthTek, which she signed on December 30, 2023. See Ex. B.

42.     Digavinti's Independent Contractor Agreement with U.S. HealthTek contained restrictive covenants.

43.     Pursuant to Digavinti's Independent Contractor Agreement, she agreed to the following valid and enforceable restrictive covenant governing inventions:

> "All right, title and interest in and to any and all ideas, processes, inventions (whether patentable or not), technology, original works of authorship, designs, formulas, copyrights, programs, systems, data, materials and all improvements, rights and claims related to the foregoing conceived, produced, developed or reduced to practice by Contractor alone or with others during Contractor's performance of the Services (collectively the "Work Product"), shall belong exclusively to the Company. Contractor hereby assigns and transfers to the Company, in perpetuity all of Contractor's worldwide rights, title and interest in and to the Work Product, including, but not limited to, all inventions, whether patentable or not, copyrights, trade secret rights, and other proprietary and intellectual property rights in such Work Product."

Ex. B at 3–4, ¶ 4.3.

44.     Under Digavinti's Independent Contractor Agreement, she had a valid and enforceable, indefinite obligation to "keep confidential and not to disclose or make unauthorized use of information pertaining in any manner to the business of the Company or to the Company's clients," to include the following types of information:

> trade secrets, confidential information, knowledge, data or other information of [U.S. HealthTek] relating to products, processes, software, know-how, designs, development tools and processes, formulas, test data, customer lists, business plans, marketing plans and strategies, plans for future development and new product concepts, costs, profits, markets, and sales, pricing strategies, employee personnel files and information about employee compensation and benefits, or other non-public subject matter pertaining to any business of [U.S. HealthTek] or any of its clients . . . which [Digavinti] may have produced, obtained, learned or otherwise acquired during the course of rendering services to [U.S. HealthTek.]

Ex. B at 3, ¶ 4.1.

45.     Digavinti also agreed, in valid and enforceable provisions, not to "disclose to any third party any reports, recommendations, conclusions or other results of the Services or the subject matter or purposes of this Agreement without the prior written consent of [U.S. HealthTek]." Ex. B at 3, ¶ 4.1.

46.     Digavinti's Independent Contractor Agreement also included valid and enforceable nonsolicitation provisions that prohibited her, during the term of the agreement and for 12 months after, from

> 1) solicit[ing] or accept[ing] business (including but not limited to an offer of employment) from [U.S. HealthTek's] clients or potential clients, or their assignees or successors in interest; or 2) induc[ing] or attempt[ing] to induce any [U.S. HealthTek] client or potential client or their assignees or successors in interest, to withdraw, curtail, divert, or

cancel its business with [U.S. HealthTek], whether on behalf of [Digavinti] or any third party.

Ex. B at 2, ¶ 2.3.

47.     Digavinti agreed that a violation of the restrictive covenants of the Independent Contractor Agreement could result in irreparable harm for U.S. HealthTek for which damages would be an inadequate remedy, and U.S. HealthTek could seek equitable relief, including an injunction, without the need to prove damages or post a bond. Ex. B at 3, ¶ 4.2.

### *Digavinti's Non-Contractual Obligations to U.S. HealthTek*

48.     During Digavinti's employment with U.S. HealthTek, she owed a duty of loyalty to U.S. HealthTek.

49.     As a result of Digavinti's duty of loyalty to U.S. HealthTek, she was barred from acting disloyally and was required to act in accordance with U.S. HealthTek's best interests at all times during her employment with U.S. HealthTek.

50.     Digavinti's common law duty of loyalty prohibited her from assisting Negosian in diverting business away from U.S. HealthTek while she was employed with U.S. HealthTek.

### *ACM Global's Relevant Contractual Obligations to U.S. HealthTek*

51.     On January 21, 2022, U.S. HealthTek and ACM Global entered into a Consulting Services Agreement in which U.S. HealthTek agreed to provide support services for information technology project management. *See* Ex. C.

52.     The valid and enforceable Consulting Services Agreement between U.S. HealthTek and ACM Global set the general parameters of the working relationship between U.S. HealthTek and ACM, and it provided that project-specific guidelines would be dictated by Statements of Work, which varied, depending on the project. Ex. C at 1, ¶ 1; Ex. C at 2, ¶ 4(a).

53.     Various Statements of Work governed the Enhanced OnePortal Project, including a Statement of Work that required ACM to provide a 90-day termination notice and a $15,000 per month flat fee for U.S. HealthTek services for up to 100 hours per month. Ex. C. at 2.

54.     The Consulting Services Agreement required ACM Global to give written notice of any objection to a U.S. HealthTek invoice within 14 days of receiving the invoice, and it provided that if ACM did not object within 14 days, it "has waived its right to object to the invoice." Ex. C at 2, ¶ 4(d).

55.     ACM Global never objected within 14 days to any invoice issued by U.S. HealthTek.

56.     The Consulting Services Agreement provided for three instances in which the agreement could be terminated: (1) if one of the parties breached the agreement and failed to cure the breach within 30 days; (2) upon five business days' notice from U.S. HealthTek to ACM that ACM failed to make payments under the contract; and (3) upon completion of the last services provided for in a Statement of Work. Ex. C at 1–2, ¶ 2(a)–(d). ACM agreed that termination of the agreement would not release ACM from its payment obligations with respect to any compensation due pursuant to the Consulting Services Agreement or any Statement of Work. Ex. C at 2, ¶ 2(d).

57.     Pursuant to the Consulting Services Agreement, ACM agreed, for 12 months following termination of the agreement, that it would not engage in the following acts of solicitation:

> directly or indirectly, recruit, or attempt to recruit, discuss employment with, or otherwise utilize the services of any person who, during the term of this Agreement, is an employee or independent contractor of [U.S. HealthTek], to perform for [ACM] any job function that is substantially related or similar to a job function provided by that individual for [U.S. HealthTek] in the

course of [U.S. HealthTek's] performance under the Agreement, including any related Statement of Work.

Ex. C at 5, ¶ 9.

58.     ACM further agreed that it would be liable to U.S. HealthTek for liquidated damages in the amount of $50,000 for each U.S. HealthTek employee or independent contractor solicited by ACM in violation of the Consulting Services Agreement. Ex. C at 5, ¶ 9.

59.     ACM agreed that "[a]ll drawings, models, designs, formulas, methods, documents, and tangible items prepared for or submitted to [ACM] by [U.S. HealthTek] in connection with the Services (the 'Deliverable Items') shall belong exclusively to [ACM]," with the following caveats: (a) "Deliverable Items" excluded "Contractor Background Technology," which included things like methods, algorithms, research, development, and processes that U.S. HealthTek created before the effective date of the Consulting Services Agreement; and (b) to the degree U.S. HealthTek incorporated "Contractor Background Technology" into the "Deliverable Items," U.S. HealthTek granted ACM a non-exclusive license to use U.S. HealthTek's "Contractor Background Technology" for any purpose. Ex. C at 4, ¶ 7.

60.     Neither Negosian nor Digavinti had authority to prepare or submit Deliverable Items to ACM after their employment with U.S. HealthTek ended.

### *Negosian's Improper Establishment of a Competing Company and Solicitation*

61.     In August 2023, CEO Reiter discovered Negosian had made exorbitant personal charges on his company credit card, without reimbursing the company, after which CEO Reiter confronted Negosian and repeatedly asked that he stop doing so, to no avail.

62.     Upon information and belief, in January 2024 or earlier, Negosian began laying the groundwork for the establishment of Rasck Consulting, a company that would directly compete with U.S. HealthTek.

63.     On or about May 6, 2024, CEO Reiter learned that Negosian had booked a cruise for him and his family, including Thomson, and scheduled it on dates that Negosian knew were essential for Thomson to be working. CEO Reiter informed Negosian that it was unacceptable for him to plan a family vacation on dates that he knew would create a disruption in U.S. HealthTek operations, after which Negosian said, "I'm done," and refused to speak to Reiter for six days.

64.     Unbeknownst to U.S. HealthTek leadership, on May 17, 2024, Negosian published the website for Rasck Consulting, Inc. (www.rasckconsulting.com), and on June 27, 2024, Negosian registered Rasck Consulting, Inc. with the California Secretary of State's Office.

65.     CEO Reiter later discovered that Negosian had used his U.S. HealthTek credit card to purchase plane tickets for extended families to attend his daughter's graduation and to purchase tickets for his family's European Disney cruise. Purchases made using Negosian's company credit card were paid out of a U.S. HealthTek bank account that was strictly authorized to fund U.S. HealthTek-related purchases. After conducting a review of Negosian's personal purchases with his company credit card, CEO Reiter realized that from 2022 to 2024, Negosian made at least $250,000 in personal purchases without reimbursing U.S. HealthTek.

66.     On July 5, 2024, U.S. HealthTek terminated the employment of Thomson, and on July 12, 2024, prior to Negosian leaving for vacation, CEO Reiter informed Negosian that his relationship with U.S. HealthTek would soon be ending.

67.     Upon information and belief, while employed with U.S. HealthTek, Negosian removed and retained confidential U.S. HealthTek files with the intent of using them to divert U.S. HealthTek clients to Rasck Consulting and undermine U.S. HealthTek's business relationships.

68.     On August 9, 2024, Negosian contacted U.S. HealthTek Business Analyst Barbara Breeden via Microsoft Teams and asked her to call him. During the conversation, they discussed the status of the Enhanced OnePortal Project, after which Negosian mentioned the possibility of him starting a consulting business; noted the high degree of talent in U.S. HealthTek's development team; said that if he was going to take any U.S. HealthTek employee to work with him at his new company, Breeden would be his first choice; and told Breeden he wanted to stay in contact with her. Breeden considered this overture to be inappropriate and did not seek further information about the opportunity Negosian presented.

69.     On information and belief, in August 2024, Negosian recruited Digavinti to resign from her position as Lead Software Engineer for U.S. HealthTek, join Rasck Consulting's efforts to undermine U.S. HealthTek by completing the Enhanced OnePortal Project for ACM Global, and continue working for Rasck Consulting thereafter.

70.     On August 12, 2024, HealthTek Founder Bryan Firestone met with DrugScan Director of Finance and Billing Tony Damico, an ACM Global employee, and they discussed the fact that Negosian would soon be leaving U.S. HealthTek. Firestone assured Damico that U.S. HealthTek was fully capable of completing the Enhanced OnePortal Project, thanks to team members like Digavinti and Breeden, and there was no reason for concern that the project would be stalled by Negosian's exit.

71.     On August 13, 2024, DrugScan General Manager Scott LaNeve, an ACM Global employee, emailed Firestone and CEO Reiter, and said,

> "I hope you guys are well. I just wanted you to know that we have discussed Robert's leaving [U.S. HealthTek] and we are happy to have [U.S. HealthTek's] continued support. While there were some immediate concerns voiced within DSI, Tony Damico told me he spoke to you last night and feels really good about your continued support for One Portal. I reinforced my position with Tony, 'We

hired [U.S. HealthTek], not Robert. Employees come and go from every organization. We hired [U.S. HealthTek] so we would not have to worry about one engineer here or there. I trust Bryan and Cristy. If Bryan and Cristy gave you their assurances, we are good.' Tony agreed with me 100%."

72.     On August 30, 2024, U.S. HealthTek CEO Reiter terminated Negosian's employment and explained in a letter that it was due to Negosian's decision to repeatedly make personal charges to his company credit card; his negative attitude and unsupportive behavior; his careless oversight of the company's timekeeping application; his inability to implement basic project tracking; and his poor performance on a project that required others to do a complete overhaul of Negosian's work.

73.     In CEO Reiter's letter of August 30, 2024, she also noted that Negosian was in violation of the terms of his U.S. HealthTek shareholder agreement and stated that U.S. HealthTek did not wish to have any U.S. HealthTek equipment returned to the company.

74.     On September 9, 2024, Digavinti submitted her resignation letter to U.S. HealthTek, stated that her last day of employment with U.S. HealthTek would be September 30, 2024, and cited the following bases: (1) it had become "increasingly difficult for [her] to manage multiple jobs"; (2) she needed to be employed by a United Kingdom-based employer to maintain her work visa status in the United Kingdom; and (3) the extension of the deadline for U.S. HealthTek to complete the Enhanced OnePortal Project for ACM Global had made it impossible for her to delay her resignation. On information and belief, Digavinti resigned so that she could exclusively work with Negosian and Rasck Consulting on projects that were, at the time, subject to contracts between U.S. HealthTek and ACM Global.

75.     On September 30, 2024, Diamond sent an email to a group of representatives from both U.S. HealthTek and ACM Global, requesting a meeting "to discuss recent concerns

related to [U.S. HealthTek's] ability to support the finalization" of the Enhanced OnePortal Project, which was an odd invitation considering the project was running smoothly. Upon information and belief, Diamond's email reflected the fact that he had been in communication with Negosian, who had convinced Diamond to work with Rasck Consulting, and Negosian was laying the groundwork for terminating ACM's contract with U.S. HealthTek and working with Negosian and Digavinti.

76.    On October 1, 2024, Damico emailed CEO Reiter on behalf of ACM Global and stated, "Is [Digavinti] still employed by [U.S. HealthTek]? Her not being on calls the last few days is concerning to the team and we are putting 2 and 2 together." This statement was odd, considering Digavinti had not been absent during any calls, and U.S. HealthTek had not yet shared the news of her resignation.

77.    On October 31, 2024, Negosian emailed CEO Reiter and stated that although CEO Reiter had implied that she was terminating his position as an officer in her letter of August 30, 2024, Negosian was formally resigning from his position as a director and officer of U.S. HealthTek, effective immediately.

78.    On November 27, 2024, Diamond emailed U.S. HealthTek Founder Bryan Firestone, said that ACM Global was "moving in a different direction," announced ACM was terminating all active agreements, requested that U.S. HealthTek stop all work immediately, said that ACM was removing all U.S. HealthTek staff members' access to product domains, and requested various types of documentation related to the contracts between U.S. HealthTek and ACM.

79.    On December 3, 2024, Firestone emailed Diamond and noted, among other things, that a 90-day termination notification was required for the Statement of Work related to

the Enhanced OnePortal Project, and ACM was therefore being invoiced $45,000, consistent with the $15,000 flat monthly rate. Firestone also reminded Diamond that under the terms of the Consulting Services Agreement, ACM was prohibited from using the services of any U.S. HealthTek employee to perform a job that was substantially similar to a job function provided by the former employee to U.S. HealthTek.

80.    On December 3, 2024, DrugScan Director of Laboratory Information Systems Jason Lichti, an ACM Global employee, inadvertently sent an email titled "on a side note…" to Negosian's former U.S. HealthTek email address; and in the email, Lichti stated, "Robert, Congratulations on starting your own company. I did call Bob after we spoke initially and I'm glad to see us going directly to you. Bob seems to think you're very capable and he's not easy to impress. Welcome!" Shortly after Lichti sent the email to Negosian's former U.S. HealthTek email address on December 3, 2024, Lichti unsuccessfully attempted to recall it.

81.    Upon information and belief, Lichti's reference to "Bob" in his email on December 3, 2024, was a reference to ACM Global's Chief Information Officer Robert "Bob" Diamond.

82.    In December 2024, Digavinti announced on her LinkedIn.com page that she had obtained an Amazon Web Services Certified Solutions Architect Associate certification, a process that usually takes months to achieve; and around the same time, Negosian announced on the website for Rasck Consulting that Rasck Consulting was now certified in the very Amazon Web Services for which Digavinti was now certified.

83.    On January 7, 2025, Diamond responded to Firestone's email invoicing ACM Global for the early termination fee of $45,000. Diamond refused to pay the fee, claiming the costs of the Enhanced OnePortal Project were excessive; and with respect to Firestone's

reminder that ACM was prohibited from soliciting former U.S. HealthTek employees, Diamond simply replied, "Not applicable." Not including the early termination fee of $45,000, ACM Global has still failed to pay U.S. HealthTek for outstanding invoices in the amount of $124,500, despite being invoiced for services rendered and not objecting to the invoices within 14 days of receiving the invoices.

84.     Upon information and belief, Negosian and Digavinti are currently being paid to use U.S. HealthTek-owned technology to complete the Enhanced OnePortal Project for ACM Global, and unless they are enjoined from doing so, it will result in irreparable harm to U.S. HealthTek.

85.     Upon information and belief, before Negosian, Digavinti, and Thomson lost access to U.S. HealthTek's systems, they deleted emails containing evidence of their coordinated efforts to undermine U.S. HealthTek, resulting in the permanent spoliation of evidence that, upon information and belief, would have provided proof of their unlawful efforts to undermine U.S. HealthTek and divert business to Rasck Consulting. To date, U.S. HealthTek has been able to recover some of these deleted emails, but countless emails have not been recoverable.

86.     Upon information and belief, Negosian and Digavinti used email accounts other than U.S. HealthTek accounts to discuss their plans to divert U.S. HealthTek business to Rasck Consulting, and Negosian has violated his valid and enforceable Employee Confidential Information and Inventions Agreement by not providing this information to U.S. HealthTek. Ex. A at 5, ¶ 5.

87.     On information and belief, while employed with U.S. HealthTek in 2024 and after the eventual termination of his employment at U.S. HealthTek in August 2024, Negosian approached Diamond to market the services of Rasck Consulting. Rasck Consulting was granted

a contract for the very type of work that U.S. HealthTek was contracted to do under the Consulting Services Agreement, including completion of the Enhanced OnePortal Project. Because ACM was one of U.S. HealthTek's most valuable clients, Negosian's diversion of ACM's business away from U.S. HealthTek will result in lost income and goodwill to U.S. HealthTek in excess of $1,000,000 annually, and it constituted unfair and unethical competition against U.S. HealthTek.

88.     On information and belief, Negosian successfully interfered with the relationship between U.S. HealthTek and ACM Global through (a) the use of confidential information, including pricing and business volume data; (b) the use of U.S. HealthTek's trade secrets related to the Enhanced OnePortal Project; and (c) solicitation of U.S. HealthTek personnel in violation of Negosian's Employee Confidential Information and Inventions Agreement with U.S. HealthTek.

89.     Negosian was never expressly or impliedly directed by U.S. HealthTek to negotiate deals that would serve the interests of any company other than U.S. HealthTek, nor was he employed by U.S. HealthTek to develop business relationships for any company other than U.S. HealthTek.

### *U.S. HealthTek's Demand Letter*

90.     Counsel for U.S. HealthTek sent a letter to Negosian on December 27, 2024, demanding, among other things, that he cease and desist from all activities in violation of his employment agreements and immediately return all trade secrets and confidential information belonging to U.S. HealthTek.

91.     Counsel for Negosian responded to U.S. HealthTek's cease and desist letter on January 2, 2024. Negosian's attorney refused to return U.S. HealthTek's confidential information

that was on any U.S. HealthTek device, reasoning that the U.S. HealthTek devices were given to Negosian and/or Thomson, and Negosian had reformatted the computers and removed any U.S. HealthTek information. Counsel for Negosian did not address the fact that other confidential information belonging to U.S. HealthTek remained in Negosian's possession.

## COUNT I
### Breach of Contract – Breach of Employee Confidential Information and Inventions Agreement
### (Negosian)

92.     The preceding allegations are incorporated in this claim by reference.

93.     Negosian entered into an Employee Confidential Information and Inventions Agreement with U.S. HealthTek, which was supported by adequate consideration, and U.S. HealthTek performed all its obligations under the agreement.

94.     The Employee Confidential Information and Inventions Agreement contained valid and enforceable restrictive covenants, including provisions prohibiting Negosian from (a) engaging, while employed, "in any employment or business activity that is competitive with, or would otherwise conflict with [his] employment by, the Company" without U.S. HealthTek's written consent; (b) soliciting, while employed and for one year after termination of employment, any employee or independent contractor to terminate his or her relationship with U.S. HealthTek in order to work for any other person or entity; and (c) inducing or attempting to induce, while employed and for one year after termination of employment, any U.S. HealthTek customer to cease doing business with U.S. HealthTek. Ex. A at 5, ¶ 4.

95.     The noncompetition provision in Negosian's Employee Confidential Information and Inventions Agreement, which was subject to a Virginia choice of law provision, was reasonable in that it merely prohibited him from competing against U.S. HealthTek without written consent while employed with the company and was not against the public policy of

Virginia in that, among other factors, the noncompetition provision was reasonably necessary for the adequate protection of U.S. HealthTek's legitimate business interests.

96.     Negosian violated the noncompetition provision when he, while employed at U.S. HealthTek, engaged in business activity that was competitive with U.S. HealthTek by setting up his own competing company and, upon information and belief, by soliciting ACM Global as a customer for his competing company while employed by U.S. HealthTek.

97.     The employee nonsolicitation provision contained in Negosian's Employee Confidential Information and Inventions Agreement was reasonable in that it merely prohibited Negosian, while employed with U.S. HealthTek and for one year after termination of employment, from soliciting or attempting to solicit current U.S. HealthTek employees and independent contractors to terminate their relationship with U.S. HealthTek.

98.     Upon information and belief, Negosian violated the employee and contractor nonsolicitation provision when he, while employed with U.S. HealthTek and within a year after termination of employment, solicited the employment of Digavinti, Breeden, Thomson, and other U.S. HealthTek employees.

99.     The customer noninterference provision contained in Negosian's Employee Confidential Information and Inventions Agreement was reasonable in that it merely prohibited Negosian, during employment and for one year thereafter, from inducing any current U.S. HealthTek customers to cease doing business with U.S. HealthTek.

100.    Negosian violated the noninterference provision when he, while employed with U.S. HealthTek and within a year after termination of employment, successfully convinced ACM Global, a U.S. HealthTek customer, to terminate its Consulting Services Agreement with U.S. HealthTek.

101.    The confidentiality provisions in Negosian's Employee Confidential Information and Inventions Agreement were reasonable in that they, among other things, merely (a) prohibited Negosian from disclosing confidential proprietary information; (b) required him to deliver to U.S. HealthTek any confidential information belonging to U.S. HealthTek upon termination of employment; (c) prohibited him from copying, deleting, or altering any information in his U.S. HealthTek computer; and (d) required him to provide, upon termination, an electronic copy of all confidential information he maintained on any electronic system and thereafter delete it.

102.    Negosian violated the confidentiality provisions when, during his employment with U.S. HealthTek and/or after termination of his employment, he disclosed confidential proprietary information to ACM Global; he did not deliver to U.S. HealthTek its confidential information in his possession after he was terminated; he copied, deleted, and altered information in his U.S. HealthTek computer; he did not provide an electronic copy to U.S. HealthTek of all confidential information he maintained on any electronic systems; and he refused to provide the information to U.S. HealthTek even after U.S. HealthTek's counsel expressly requested the information.

103.    The restrictions in Negosian's Employee Confidential Information and Inventions Agreement were not unreasonably harsh or oppressive in curtailing Negosian's legitimate efforts to earn a livelihood.

104.    As a consequence of Negosian's breach of the restrictive covenants contained in his Employee Confidential Information and Inventions Agreement, U.S. HealthTek has suffered and will continue to suffer irreparable harm, as acknowledged by Negosian in his Employee Confidential Information and Inventions Agreement. Ex. A at 7, ¶ 8.6.

## COUNT II
### Breach of Contract – Breach of Independent Contractor Agreement
### (Digavinti)

105.    The preceding allegations are incorporated in this claim by reference.

106.    Digavinti entered into an Independent Contractor Agreement with U.S. HealthTek, which was supported by adequate consideration, and U.S. HealthTek performed all its obligations under the agreement.

107.    Digavinti's Independent Contractor Agreement, which was subject to a Virginia choice of law provision, contained valid and enforceable provisions that were reasonable in that they merely prohibited Digavinti, during the term of the agreement and for 12 months after, from (a) soliciting or accepting business from U.S. HealthTek's clients; and (b) inducing or attempting to induce any U.S. HealthTek client to end its business relationship with U.S. HealthTek.

108.    Upon information and belief, Digavinti violated the nonsolicitation and noninterference provisions during employment with U.S. HealthTek and/or after resigning when she accepted business from ACM Global and assisted in Negosian's efforts to induce ACM to terminate its contract with U.S. HealthTek.

109.    The confidentiality provisions in Digavinti's Independent Contractor Agreement were reasonable in that they, among other things, merely prohibited her from revealing or making unauthorized use of U.S. HealthTek's confidential proprietary information without the prior written consent of U.S. HealthTek.

110.    Upon information and belief, Digavinti violated the confidentiality provisions when, during her employment with U.S. HealthTek and/or within 12 months of her resignation from employment, she made unauthorized use of U.S. HealthTek's confidential information

regarding the Enhanced OnePortal Project by using the information to complete the Enhanced OnePortal Project for Rasck Consulting and Negosian.

111.    The restrictions in Digavinti's Independent Contractor Agreement were not unreasonably harsh or oppressive in curtailing Digavinti's legitimate efforts to earn a livelihood.

112.    As a consequence of Digavinti's breach of the restrictive covenants contained in her Independent Contractor Agreement, U.S. HealthTek has suffered and will continue to suffer irreparable harm, as acknowledged by Digavinti in her Independent Contractor Agreement. Ex. B at 3, ¶ 4.2

## COUNT III
### Breach of Employment Agreements: Covenant of Good Faith and Fair Dealing
### (Negosian, Digavinti)

113.    The preceding allegations are incorporated in this claim by reference.

114.    A contractual relationship existed between U.S. HealthTek and Negosian in the form of the Employee Confidentiality and Inventions Agreement.

115.    A contractual relationship existed between U.S. HealthTek and Digavinti in the form of the Independent Contractor Agreement.

116.    Negosian breached his duty of good faith and fair dealing through, among other things, maliciously using, without authorization, U.S. HealthTek's trade secrets and confidential information to set up Rasck Consulting, a competing business; using, without authorization and for the purpose of competing against U.S. HealthTek, inventions to which he expressly assigned U.S. HealthTek ownership; soliciting U.S. HealthTek personnel to work for Negosian's competing business; deleting electronic files belonging to U.S. HealthTek in an effort to hide his misdeeds; refusing to turn over and thereafter destroy records belonging to U.S. HealthTek; and convincing one of U.S. HealthTek's most valuable clients to terminate its contract with

U.S. HealthTek and instead to forge a partnership with Negosian, likely through Rasck Consulting.

117.    Digavinti breached her duty of good faith and fair dealing through, among other things, maliciously using, without authorization, U.S. HealthTek's trade secrets and confidential information to help Negosian set up Rasck Consulting, a competing business; using, without authorization and for the purpose of competing against U.S. HealthTek, inventions to which she expressly assigned U.S. HealthTek ownership; deleting electronic files belonging to U.S. HealthTek in an effort to hide her misdeeds; and assisting Negosian in convincing one of U.S. HealthTek's most valuable clients to terminate its contract with U.S. HealthTek and forge a partnership with Negosian and Rasck Consulting instead.

118.    Negosian and Digavinti have benefitted and will continue to benefit from their wrongful conduct in violation of their duties to U.S. HealthTek pursuant to the implied covenant of good faith and fair dealing in their employment agreements.

119.    Negosian and Digavinti have destroyed the value of their agreements with U.S. HealthTek, which has consequently been deprived of the benefit of its bargain, resulting in economic injuries to U.S. HealthTek as a result of this breach, and U.S. HealthTek is entitled to recover compensatory damages from Negosian and Digavinti in excess of $1,000,000.

## COUNT IV
### Breach of the Duty of Loyalty
### (Negosian, Digavinti)

120.    The preceding allegations are incorporated in this claim by reference.

121.    As U.S. HealthTek employees, Negosian and Digavinti owed a fiduciary duty of loyalty to U.S. HealthTek during their employment that was separate from their other express contractual obligations to U.S. HealthTek.

122.     Part of Negosian's and Digavinti's duty of loyalty included specific duties not to compete against U.S. HealthTek while employed there, not to misuse confidential information and trade secrets, and not to solicit U.S. HealthTek's employees and customers prior to termination of employment.

123.     Negosian went beyond merely planning to compete with U.S. HealthTek after employment and breached of his duty of loyalty by misusing confidential information and trade secrets to set up Rasck Consulting; by soliciting U.S. HealthTek employees and contractors, including Digavinti, Breeden, and Thomson, to work for Rasck Consulting; and by soliciting U.S. HealthTek's customers, including ACM Global.

124.     Digavinti went beyond merely planning to compete with U.S. HealthTek after employment and breached her duty of loyalty by misusing confidential information and trade secrets to help Negosian set up Rasck Consulting so that Negosian could successfully solicit ACM Global, one of U.S. HealthTek's most valued customers.

125.     Upon information and belief, Negosian earned in excess of $500,000 directly from ACM Global through his willful and malicious actions in diverting ACM away from U.S. HealthTek.

126.     Upon information and belief, Digavinti earned in excess of $50,000 indirectly from ACM Global through her willful and malicious actions in assisting Negosian in diverting ACM away from U.S. HealthTek.

127.     As a direct and proximate result of the breach of the duty of loyalty by Negosian and Digavinti, U.S. HealthTek has suffered injuries, including the annual loss of revenue from ACM Global, having a value of not less than $1,000,000.

128.    U.S. HealthTek is, therefore, entitled to recover compensatory damages for the breach of loyalty by Negosian and Digavinti in excess of the $1,000,000 in annual losses of which U.S. HealthTek is currently aware, plus punitive damages for the willful and wanton conduct of Negosian and Digavinti.

## COUNT V
### Tortious Interference with Contractual Relations
### (Negosian, Digavinti)

129.    The preceding allegations are incorporated in this claim by reference.

130.    U.S. HealthTek had a longstanding contractual relationship with ACM Global; and both Negosian and Digavinti were aware of the relationship and U.S. HealthTek's reasonable certainty that the relationship would continue for the purposes of the Enhanced OnePortal Project as well as future projects under the companies' Consulting Services Agreement.

131.    Upon information and belief, during Negosian's employment with U.S. HealthTek and after his termination, he interfered with U.S. HealthTek's contractual relations with ACM when he (a) used U.S. HealthTek's confidential information to position Rasck Consulting to have the information needed to complete the Enhanced OnePortal Project; (b) recruited Digavinti, the co-leader of the Enhanced OnePortal team, to leave U.S. HealthTek and join Rasck Consulting; (c) marketed the services of Rasck Consulting, including Digavinti's services, to ACM Chief Information Officer Diamond; and (d) convinced ACM, through Diamond, to terminate its contract with U.S. HealthTek in order to arrange a profitable working arrangement for Rasck Consulting and Negosian.

132.    Upon information and belief, during Digavinti's employment with U.S. HealthTek and after her resignation, she interfered with U.S. HealthTek's contractual

relations with ACM when she (a) used U.S. HealthTek's confidential information to help Negosian position Rasck Consulting to have the information needed to complete the Enhanced OnePortal Project; (b) offered her assistance to help Negosian convince ACM, through Diamond, to terminate its contract with U.S. HealthTek to arrange a profitable working arrangement for Rasck Consulting and Negosian; and (c) resigned to help Negosian complete the work on the Enhanced OnePortal Project, rather than complete the work for U.S. HealthTek, as she had agreed.

133.   If Negosian and Digavinti had not interfered with U.S. HealthTek's contractual relationship with ACM, it is reasonably certain that the two companies would have seen the Enhanced OnePortal Project contract through to completion, and they would have also gone on to contract additional projects under their Consulting Services Agreement.

134.   Despite Negosian's and Digavinti's contractual obligations and the parties' expectations, Negosian and Digavinti intentionally and wrongfully used their insider knowledge to induce ACM to terminate its contract with U.S. HealthTek.

135.   In interfering with the contractual relations of U.S. HealthTek and ACM, Negosian and Digavinti caused U.S. HealthTek to lose one of its most profitable customer accounts, and U.S. HealthTek is entitled to recover compensatory damages from Negosian and Digavinti in an amount of U.S. HealthTek's annual lost profits, which is in excess of $1,000,000, plus punitive damages based on Negosian's and Digavinti's willful and wanton conduct.

136.   U.S. HealthTek is unaware of other U.S. HealthTek clients who have terminated their relationships with U.S. HealthTek to contract with Negosian and Rasck Consulting, but U.S. HealthTek expects that in the absence of injunctive relief prohibiting Negosian and Digavinti from engaging in the unfair business practices described above, they will continue

taking such efforts to destroy U.S. HealthTek's business, which would cause incalculable additional losses to its goodwill, customer base, contractual relationships, and employment relationships.

137.    Unless Negosian and Digavinti are enjoined from continuing to interfere wrongfully with U.S. HealthTek's business relationships, U.S. HealthTek will likely suffer irreparable harm, as acknowledged by Negosian and Digavinti in their employment agreements. Ex. A at 7, ¶ 8.6; Ex. B at 3, ¶ 4.2.

## COUNT VI
### Tortious Interference with Prospective Advantage
### (Negosian, Digavinti)

138.    The preceding allegations are incorporated in this claim by reference.

139.    U.S. HealthTek had a longstanding contractual relationship with ACM Global; and both Negosian and Digavinti were aware of the relationship and U.S. HealthTek's reasonable certainty that the relationship would continue for the purposes of the Enhanced OnePortal Project as well as future projects under the companies' Consulting Services Agreement.

140.    Upon information and belief, during Negosian's employment with U.S. HealthTek and after his termination, he interfered with U.S. HealthTek's contractual relations with ACM when he (a) used U.S. HealthTek's confidential information to position Rasck Consulting to have the information needed to complete the Enhanced OnePortal Project; (b) recruited Digavinti, the co-leader of the Enhanced OnePortal team, to leave U.S. HealthTek and join Rasck Consulting; (c) marketed the services of Rasck Consulting, including Digavinti's services, to ACM Chief Information Officer Diamond; and (d) convinced ACM, through

Diamond, to terminate its contract with U.S. HealthTek in order to arrange a profitable working arrangement for Rasck Consulting and Negosian.

141.    Upon information and belief, during Digavinti's employment with U.S. HealthTek and after her resignation, she interfered with U.S. HealthTek's contractual relations with ACM when she (a) used U.S. HealthTek's confidential information to help Negosian position Rasck Consulting to have the information needed to complete the Enhanced OnePortal Project; (b) offered her assistance to help Negosian convince ACM, through Diamond, to terminate its contract with U.S. HealthTek to arrange a profitable working arrangement for Rasck Consulting and Negosian; and (c) resigned to help Negosian complete the work on the Enhanced OnePortal Project, rather than complete the work for U.S. HealthTek, as she had agreed.

142.    If Negosian and Digavinti had not interfered with U.S. HealthTek's contractual relationship with ACM, it is reasonably certain that the two companies would have seen the Enhanced OnePortal Project contract through to completion, and they would have also gone on to contract additional projects under their Consulting Services Agreement.

143.    In Negosian's and Digavinti's efforts to induce ACM to terminate its contract with U.S. HealthTek, they used improper means, to include misappropriating trade secrets, misusing U.S. HealthTek's confidential information, breaching their fiduciary duty to U.S. HealthTek, and/or successfully soliciting U.S. HealthTek employees.

144.    In interfering with the contractual relations of U.S. HealthTek and ACM, Negosian and Digavinti caused U.S. HealthTek to lose one of its most profitable customer accounts, and U.S. HealthTek is entitled to recover compensatory damages from Negosian and

Digavinti in an amount of U.S. HealthTek's annual lost profits, which is in excess of $1,000,000, plus punitive damages based on Negosian's and Digavinti's willful and wanton conduct.

145.    U.S. HealthTek is unaware of other U.S. HealthTek clients who have terminated their relationships with U.S. HealthTek to contract with Negosian and Rasck Consulting, but U.S. HealthTek expects that in the absence of injunctive relief prohibiting Negosian and Digavinti from engaging in the unfair business practices described above, they will continue taking such efforts to destroy U.S. HealthTek's business, which would cause incalculable additional losses to its goodwill, customer base, contractual relationships, and relationships with its employees.

146.    Unless Negosian and Digavinti are enjoined from continuing to interfere wrongfully with U.S. HealthTek's business relationships, U.S. HealthTek will likely suffer irreparable harm, as acknowledged by Negosian and Digavinti in their employment agreements. Ex. A at 7, ¶ 8.6; Ex. B at 3, ¶ 4.2.

## COUNT VII
### Unjust Enrichment
### (Negosian)

147.    The preceding allegations are incorporated in this claim by reference.

148.    Negosian used U.S. HealthTek's company credit card to make at least $250,000 in personal purchases on his and his family's behalf from 2022 to 2024, and he had no intention of repaying these charges.

149.    Negosian was warned by CEO Reiter that he could not continue making personal purchases with his company credit card, and he ignored this admonition.

150.    Negosian has not reimbursed U.S. HealthTek for any of the personal charges he made on his credit card.

151.    As a direct and proximate result of Negosian's actions, he has been unjustly enriched by effectively stealing funds from U.S. HealthTek's company accounts.

152.    U.S. HealthTek is entitled to recover compensatory damages from Negosian for all unauthorized amounts Negosian charged to U.S. HealthTek credit cards for personal purchases.

## COUNT VIII
**Conversion**
**(Negosian)**

153.    The preceding allegations are incorporated in this claim by reference.

154.    Negosian used U.S. HealthTek's company credit card to make over $250,000 of personal purchases on his and his family's behalf from 2022 to 2024.

155.    Negosian made personal, unauthorized expenditures on a U.S. HealthTek credit card that was paid for out of a U.S. HealthTek bank account strictly authorized to fund company-related purchases.

156.    Negosian has not reimbursed U.S. HealthTek for any personal charges he made on his credit card, and he had no intention to repay these charges.

157.    U.S. HealthTek is entitled to recover compensatory damages from Negosian for all unauthorized amounts Negosian charged to U.S. HealthTek credit cards for personal purchases.

## COUNT IX
**Breach of Contract: Breach of Consulting Services Agreement**
**(ACM Global)**

158.    The preceding allegations are incorporated in this claim by reference.

159.    ACM Global entered into a Consulting Services Agreement with U.S. HealthTek, which was supported by adequate consideration, and U.S. HealthTek performed all its obligations under the agreement.

160.    The Consulting Services Agreement, which was subject to a Virginia choice of law provision, included reasonable terms that provided three instances in which the agreement could be terminated: (1) if one of the parties breached the agreement and failed to cure the breach within 30 days; (2) upon five business days' notice from U.S. HealthTek to ACM that ACM failed to make payments under the contract; and (3) upon completion of the last services provided for in a Statement of Work. None of the three termination-permitting contingencies took place, and ACM Global breached the agreement by terminating it in order to obtain U.S. HealthTek's trade secrets from Negosian and Digavinti without paying U.S. HealthTek the fair market value for those trade secrets.

161.    One of the Statements of Work governing the Enhanced OnePortal Project included reasonable provisions obligating ACM to pay a flat rate of $15,000 per month for up to 100 hours per month, and it also required ACM to give 90 days' notice before terminating the Statement of Work. ACM also agreed, pursuant to the Consulting Services Agreement, that if it did not object to an invoice within 14 days of its issuance, it waived the right to lodge an objection.

162.    ACM did not give any notice before terminating its contract with U.S. HealthTek, and U.S. HealthTek therefore invoiced ACM $45,000 in accordance with the terms of the Statement of Work. U.S. HealthTek invoiced ACM for the $45,000, and ACM failed to lodge an objection within 14 days, thereby waiving its right to do so.

163.    Additional Statements of Work governing the Enhanced OnePortal Project obligated ACM to pay outstanding invoices in the amount of $124,500. ACM agreed, pursuant to the Consulting Services Agreement, that if it did not object to an invoice within 14 days of its issuance, it waived the right to lodge an objection. U.S. HealthTek invoiced ACM for these amounts, and ACM failed to lodge an objection to the invoices within 14 days, thereby waiving its right to do so.

164.    The employee nonsolicitation provision contained in ACM's Consulting Services Agreement was reasonable in that it merely prohibited ACM, for 12 months after termination of agreement, from recruiting any U.S. HealthTek employee or otherwise using the services of any U.S. HealthTek employee to do work related to the employee's work for U.S. HealthTek in accordance with the Consulting Services Agreement, including any related Statement of Work; and the provision expressly provided that ACM would be liable in the amount of $50,000 per employee solicited by ACM in violation of the provision.

165.    Upon information and belief, ACM violated the employee nonsolicitation provision when ACM, within a year after terminating the Consulting Services Agreement, solicited and/or employed Negosian, Digavinti, and Thomson to perform work that was related to the work that all three former U.S. HealthTek employees had done for ACM pursuant to the Consulting Services Agreement and Statements of Work.

166.    ACM's termination of the Enhanced OnePortal Project contract without notice renders it liable to pay U.S. HealthTek $45,000, plus interest, pursuant to the terms of the applicable Statement of Work. ACM is also liable, pursuant to the Consulting Services Agreement and related Statements of Work, to compensate U.S. HealthTek for $124,500, plus interest, in unpaid invoices. Further, ACM's breach of the employee nonsolicitation provision of

the Consulting Services Agreement renders it liable in the amount of $150,000 for the solicitation and/or employment of Negosian, Digavinti, and Thomson, as well as additional amounts of $50,000 for any other U.S. HealthTek employees it has solicited and/or employed in breach of the Consulting Services Agreement.

## COUNT X
### Misappropriation of Trade Secrets in violation of Va. Code Ann. § 59.1–336
### (Negosian, Digavinti, and ACM Global)

167.    The preceding allegations are incorporated in this claim by reference.

168.    Upon information and belief, Defendants misappropriated U.S. HealthTek's confidential and proprietary information, including detailed models, designs, formulas, methods, documents, and tangible items, which ACM Global improperly obtained through Negosian and Digavinti, to allow ACM Global to use the Enhanced OnePortal technology without having to pay U.S. HealthTek the fair market value for ACM's use of the trade secrets needed to operate the technology. This information is protectable as a trade secret, in that U.S. HealthTek derives independent economic value from the information not being generally known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from the information's disclosure or use. The information is also protectable as a trade secret in that U.S. HealthTek made efforts to protect the information that are reasonable under the circumstances.

169.    Defendants misappropriated U.S. HealthTek's trade secret information by entering into an agreement that required Negosian and Digavinti to obtain the information and use it for the benefit of Defendants and to the disadvantage of U.S. HealthTek, in violation of agreements between Defendants and U.S. HealthTek that prohibited the unauthorized use of this information.

170.     Defendants' improper use of the trade secrets constitutes misappropriation in that at the time of disclosure or use, ACM Global knew or had reason to know that the trade secret information was acquired under circumstances giving rise to a duty to maintain its secrecy and in disregard for Negosian's and Digavinti's duty to U.S. HealthTek to maintain the secrecy of the information. Specifically, upon information and belief, ACM Global has obtained from Negosian and Digavinti specific information about U.S. HealthTek's models, designs, formulas, methods, documents, product pricing, and security measures. This information possesses independent economic value from not being generally known in the industry and is subject to reasonable efforts to maintain its confidentiality.

171.     U.S. HealthTek will suffer actual losses as a result of ACM's misappropriation of trade secrets in that ACM obtained the information without going through proper contractual channels and paying to U.S. HealthTek the fair market value of the information; and Negosian and Digavinti profited at the expense of U.S. HealthTek by providing U.S. HealthTek's trade secrets to ACM.

172.     Defendants' misappropriation was willful and malicious, thus entitling U.S. HealthTek to punitive damages pursuant to Va. Code § 59.1-338(B) and attorneys' fees pursuant to Va. Code § 59.1-338.1.

## COUNT XI
### Breach of Contract: Breach of Covenant of Good Faith and Fair Dealing
### (ACM Global)

173.     The preceding allegations are incorporated in this claim by reference.

174.     A contractual relationship existed between U.S. HealthTek and ACM Global in the form of a Consulting Services Agreement.

175.    ACM Global breached its duty of good faith and fair dealing by employing in bad faith at least three former U.S. HealthTek employees who were willing to provide, in violation of their employment agreements, U.S. HealthTek's confidential information.

176.    Upon information and belief, ACM breached its duty of good faith and fair dealing in order to reduce the costs of the Enhanced OnePortal Project and avoid paying a fair market value for the trade secrets needed to operate the product.

177.    ACM has benefitted and will continue to benefit from its wrongful conduct in violation of its duties to U.S. HealthTek pursuant to the implied covenant of good faith and fair dealing in its Consulting Services Agreement.

178.    ACM has destroyed the value of its Consulting Services Agreement with U.S. HealthTek, which has consequently been deprived of the benefit of its bargain, resulting in economic injuries to U.S. HealthTek as a result of this breach, and U.S. HealthTek is entitled to recover compensatory damages from ACM in excess of $1,000,000.

## COUNT XII
### Statutory Business Conspiracy in Violation of Va. Code §§ 18.2-499 and 18.2-500
### (ACM Global, Negosian, Digavinti)

179.    The preceding allegations are incorporated in this claim by reference.

180.    Upon information and belief, Negosian intentionally and maliciously conspired to divert business from U.S. HealthTek and send it to Rasck Consulting and himself; and he undertook a scheme, with the help of Digavinti, to market U.S. HealthTek's trade secrets in order to convince ACM Global to terminate its contractual relationship with U.S. HealthTek.

181.    ACM Global joined the conspiracy, despite knowing that Negosian and Digavinti were engaged in unfair business practices that were intended to maliciously injure U.S. HealthTek, as evidenced by the fact that, in hiring Negosian and Digavinti, ACM willfully

violated the valid and enforceable nonsolicitation provision of ACM's Consulting Services Agreement with U.S. HealthTek.

182.    The conspiracy between ACM, Negosian, and Digavinti has caused U.S. HealthTek to suffer reasonably foreseeable damages, including but not limited to, loss of its trade secrets and confidential information, lost profits, loss of trade, goodwill, business, and reputation in the marketplace.

### PRAYER FOR RELIEF

WHEREFORE, U.S. HealthTek respectfully requests a trial by jury and seeks the following relief:

1.    The Court award U.S. HealthTek damages against Defendants for not less than $1,000,000, with a specific amount to be determined at trial;

2.    The Court award U.S. HealthTek punitive damages for Defendants' malicious, willful, and wanton conduct;

3.    The Court enjoin Defendants from continuing to impermissibly use and misappropriate Defendants' trade secrets;

4.    The Court award Defendants its reasonable attorneys' fees incurred in bringing this action to the full extent permitted by law;

5.    The Court tax the cost of this action against Defendants; and

6.    For such other and further relief as the Court may deem just and proper.

Respectfully submitted on January 23, 2025,

      /s/ *L. Lee Byrd*
L. Lee Byrd (VSB No. 28662)
Faith A. Alejandro (VSB No. 80076)
Joshua L. Rogers[1]
SANDS ANDERSON PC
Truist Plaza, Suite 2300
919 East Main Street 23219
P.O. Box 1998
Richmond, Virginia 23218-1998
Office: (804) 648-1636
Fax: (804) 783-7291
E-mail: lbyrd@sandsanderson.com
E-mail: jrogers@sandsanderson.com
*Counsel for U.S. HealthTek, Inc.*

---

[1] Mr. Rogers was sworn in to the Virginia Bar on January 15, 2025, but he has not yet received his Virginia Bar number. Mr. Rogers will be applying for admission to this Court upon receipt of his bar number.