IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| U.S. HEALTHTEK, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 1:25-cv-130 (RDA/LRV) |
| ROBERT NEGOSIAN, *et al.*, | ) ) ) |
| Defendants. | ) ) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court on Plaintiff U.S. Healthtek, Inc.'s ("USHT") Motion for Preliminary Injunction and Temporary Restraining Order ("Motion"). Dkt. 5. Considering the Motion and accompanying exhibits and declarations together with Plaintiff's Memorandum in Support, Dkt. 6, Defendants Robert Negosian's and Kiranmayee Digavinti's Memorandum in Opposition, Dkt. 19,[1] Defendant ACM Global Laboratories' ("ACM") Memorandum in Opposition, Dkt. 21, Plaintiff's Reply, Dkt. 25, and the arguments heard during the February 26, 2025 hearing, this Court GRANTS-IN-PART and DENIES-IN-PART Plaintiff's Motion for the reasons that follow.[2]

---

[1] Defendants Negosian and Digavinti are collectively referred to as the Individual Defendants.

[2] Plaintiff also have pending a Motion for Leave to File Excess Pages. Dkt. 23. It would have been the preference of the Court to ask permission for leave to File Excess Pages, and then if the motion is granted, file the brief. Under the circumstances, however, the Court will give Plaintiff the benefit of grace. The Motion will be granted.

1

I. BACKGROUND

A. Factual Background

USHT is in the business of supplying lab-focused information technology support to the healthcare industry. Dkt. 6 at 2. In this regard, USHT provides software to facilitate customer relations management and assists with the functionality of its clients' data systems. *Id.* ACM is one of the most valuable clients of USHT. Dkt. 6-5 at 2. In 2022, ACM and USHT entered into a Consulting Services Agreement (the "ACM Contract") in which USHT agreed to develop a project known as the "Enhanced OnePortal" project. Dkt. 6-5 at 3. In the ACM Contract, USHT and ACM agreed that "[a]ll drawings, models, designs, formulas, methods, documents, and tangible items prepared for or submitted to [ACM] by [USHT] in connection with the Services (the 'Deliverable Items') shall belong exclusively to [ACM]." Dkt. 6-3 at 4. The ACM Contract further provided that ACM would not "directly or indirectly, recruit, or attempt to recruit, discuss employment with, or otherwise utilize the services of any person who, during the term of this Agreement, is an employee or independent contractor of [USHT]." *Id*. at 5. The ACM Contract provided that, if ACM breached the non-solicitation provision, ACM would be liable for liquidated damages in the amount of $50,000 per individual solicited. *Id.*

In 2023, Negosian was the Chief Operating Officer, President, and a minority shareholder at USHT. Dkt. 6 at 4. Negosian was one of the faces of USHT and worked with ACM in that capacity. *Id.* Digavinti is a software engineer who worked with USHT. *Id.* Together, Negosian and Digavinti, as well as another USHT employee Barbara Breeden, were the "most central" employees on the Enhanced OnePortal project. *Id.* at 6. Negosian and Digavinti were also parties to employment contracts with USHT. In 2021, Negosian signed a confidentiality agreement with USHT (the "Negosian Contract"), which contains certain provisions regarding confidentiality and

also contains a non-solicitation provision that states that Negosian will not: (i) engage in competitive activities during his employment with USHT; (ii) for one year after the termination of his employment with USHT, either directly or indirectly solicit any USHT contractor or employee; and/or (iii) for one year after employment with USHT, either directly or indirectly induce or attempt to induce any customer of USHT to cease doing business with USHT or "in any way interfere with the relationship between any customer of Company." Dkt. 6-1 at 5. In 2023, Digavinti signed the Independent Contract Agreement with USHT (the "Digavinti Contract"), which also contains certain provisions regarding confidentiality and provides that, for a period of 12 months following the termination of her employment, Digavinti will not: (i) solicit or *accept* business from USHT's clients; or (ii) induce or attempt to induce any USHT client from to withdraw, curtail, divert, or cancel their business with USHT. Dkt. 6-2 at 2 (emphasis added).

In fall 2023, USHT CEO Cristy Reiter realized that Negosian's relationship with USHT was souring when she discovered exorbitant personal charges on Negosian's company credit card. Dkt. 6 at 7. After a confrontation with Reiter, Negosian published the website for a new company, Rasck Consulting, in May 2024. *Id.* In June 2024, Rasck Consulting was incorporated in California. *Id.* In July 2024, UHST founder Bryan Firestone informed Negosian that his relationship with USHT was coming to an end and instructed Negosian to stop contacting USHT clients. *Id.* at 8. USHT was not concerned about Negosian leaving because "Negosian was incapable of executing his ideas without the help of specialists like Breeden and Digavinti." *Id.* As this was happening, USHT was assured by Digavinti that she would remain with USHT until the Enhanced OnePortal project was completed. *Id.*

In August 2024, USHT advised ACM that Negosian was leaving, but USHT intimated that they were working on a consulting arrangement with Negosian. Dkt. 21 at 6. ACM was concerned

3

about these developments. *Id.* Despite their concern, on August 13, 2024, ACM informed USHT that ACM intended to remain with USHT as the reason ACM had hired a USHT was "so we would not have to worry about one engineer here or there." *Id.* at 8.

On August 9, 2024, Negosian contacted Breeden via Microsoft Teams and asked her to call him. Dkt. 6 at 9. During this call, Negosian mentioned that he was starting a consulting business and made overtures to her suggesting that she should come with him and asking her to stay in contact. *Id.* On August 13, 2024, Negosian responded to a July 16, 2024 email from an ACM employee and asked that ACM employee Jason Lichti should "give [Negosian] a call" regarding "[s]omething I want to discuss with him before moving forward." *Id.* at 10. On August 30, 2024, USHT terminated Negosian's employment. *Id.*

In September 2024, an ACM client left ACM for a competitor because the Enhanced OnePortal project was still not complete. Dkt. 21 at 8. During the same time period, ACM internal emails reflect a sense of confusion, because, after Negosian's departure, USHT had failed to identify a point of contact for ACM regarding the project and concern that "we aren't getting what we need." *Id.* at 9.

On September 9, 2024, USHT received a resignation letter from Digavinti stating that her last day of employment would be September 30, 2024. *Id.* at 10. Digavinti stated that she was resigning because: (i) it was becoming difficult for her to manage multiple jobs; (ii) she had visa issues; and (iii) the extension of the deadline for USHT to complete the Enhanced OnePortal project had made it impossible for her to delay her resignation. *Id.* at 11. According to Negosian, Digavinti contacted Negosian to state that she was unhappy at USHT and asked if there would be an opportunity for her at Rasck. Dkt. 19-1. Negosian hired Digavinti as an independent contractor on December 1, 2024. *Id.*

4

On September 30, 2024, internal ACM emails reflect concern that Digavinti – who had already given her resignation to USHT – had not been on calls and was not available for future calls. Dkt. 21 at 9. ACM then reached out to USHT to "discuss recent concerns relating to [USHT's] ability to support finalization" of the Enhanced OnePortal project. Dkt. 6 at 11. On October 1, 2024, ACM reached out to Reiter to specifically ask "Is [Digavinti] still employed by [USHT]?" *Id.* In a call between USHT and ACM, USHT informed ACM that Digavinti was "scaling back" her work. Dkt. 21 at 10.

On October 31, 2024, Negosian informed USHT that he was formally resigning from his position as a director and officer of USHT. Dkt. 6 at 11. That same day, ACM reached out to Negosian seeking assistance and stating that they were unhappy with USHT. Dkt. 21 at 10. In the meantime, ACM continued to work with USHT. *Id.* On November 14, 2024, USHT contacted ACM regarding the project stating that it was "crunch time." Dkt. 21 at 10. Internal ACM emails reveal ACM's frustration with USHT, as ACM employees felt that "crunch time was 4 months ago." *Id.* at 11.

Negosian reports that in October 2024, ACM contacted Negosian to see if Rasck could support the completion of the Enhanced OnePortal project. Dkt. 19-1 at 5. Negosian said that he could and stated he would need the source code and related documentation as Negosian was not in possession of the code. *Id.*

On November 27, 2024, ACM emailed USHT to terminate the ACM Contract. Dkt. 6 at 12. In the termination notice, ACM requested: (i) past and current functional requirement documents (use-case, workflows, screen designs); (ii) architectural and design (database design, component design, data flows, data backup locations); (iii) change management information (change requests/statuses, listing of all bugs/issues); (iv) content created (training manuals, videos,

5

user guides); (v) onboarding documents (data load templates, new account checklist, user training checklist); (vi) access information (passwords, etc.); and (vii) status listing all open and in-progress efforts with latest correspondence and information. Dkt. 21 at 11. On December 3, 2024, USHT responded to ACM stating: (i) "[a]ll documents that we have will be provided in a zip file per your request" once "final payments are received"; and (ii) asserting that the ACM Contract "provides that you cannot, without our written consent, utilize the services of any person who was an employee or contractor . . . to perform any job function that is substantially similar to a job function provided by that individual to USH." Dkt. 6-14 at 5.

That same day, Lichti emailed Negosian at Negosian's USHT email address congratulating Negosian on starting his own company and implying that Negosian would be working with ACM. Dkt. 6-15. After sending, Licthi tried unsuccessfully to recall that email. Dkt. 6-16.

On December 11, 2024, USHT, by counsel, sent ACM a letter instructing ACM to cease using the services of Negosian and Digavinti. Dkt. 6-18.

In late December 2024, USHT discovered that Negosian had deleted hundreds of emails from his USHT email account before leaving the company. Dkt. 6 at 14. USHT subsequently sent Negosian a cease-and-desist letter reminding him of his obligations under the Negosian Contract. *Id.* On January 2, 2025, Negosian responded to that letter stating that "Negosian denies any misappropriation of 'trade secret or confidential information.'" Dkt. 6-20 at 2.

In December 2024, Digavinti announced on LinkedIn that she had obtained an Amazon Web Services Certified Solutions Architect Associate certification. Dkt. 6 at 15. At the same time, Negosian announced on rasckconsulting.com that Rasck was now certified in the same services. *Id.*

6

On January 9, 2025, USHT sent Digavinti a letter reminding her of her obligations pursuant to the Digavinti Contract. *Id.*

On January 23, 2025, ACM employees sent emails to Negosian and Digavinti's former USHT email addresses making requests related to the Enhanced OnePortal project. *Id.* On January 31, 2025, another ACM employee sent Digavinti an email to her USHT email address requesting modifications related to Enhanced OnePortal. *Id.* at 16. Additionally, ACM-related webpages indicate that that the "development of the Enhanced One Portal is complete" and that it is scheduled to go live on April 1, 2025. *Id.* at 16.

### B. Procedural Background

USHT filed its Complaint on January 23, 2025. Dkt. 1. On February 6, 2025, USHT filed its Amended Complaint. Dkt. 4. That same day it filed the pending motion for a preliminary injunction and temporary restraining order. Dkt. 5. On February 18, 2025, ACM entered its appearance and sought to file its opposition brief on February 21, 2025. Dkt. 15. That motion was granted. Dkt. 16. On February 21, 2025, all Defendants filed their Oppositions to the pending Motion. Dkts. 19, 21. On February 24, 2025, Plaintiff filed its Reply in support of the Motion. Dkt. 25. On February 26, 2025, oral argument was heard regarding the Motion. Dkt. 27.

## II. STANDARD OF REVIEW

A motion for a temporary restraining order and a motion for a preliminary injunction are both subject to the requirements of Federal Rule of Civil Procedure 65(b). "While a preliminary injunction preserves the status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). A grant of injunctive relief requires the movant to establish: (1) that the plaintiff will likely succeed on the

7

merits; (2) that the plaintiff will likely suffer irreparable harm if the injunction is denied; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Stated succinctly, a review of the factors set forth in *Winter* establishes that USHT has only satisfied its burden in part and that a limited injunction is appropriate as to Negosian and Digavinti. At this time, USHT has failed to establish that injunctive relief is proper as to ACM. The analysis follows.

### III. ANALYSIS

Although USHT has asserted thirteen counts in its Amended Complaint, USHT does not contend that all of the counts support injunctive relief. In its Memorandum, USHT essentially argues three categories of claims support injunctive relief: (i) misappropriation of trade secrets; (ii) breach of contract/tortious interference; and (iii) business conspiracy. Dkt. 6 at 19. The Court will address each category in turn, keeping in mind that, where multiple causes of action are alleged, "finding a likelihood of success on only one claim is sufficient to 'justify injunctive relief.'" *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 494 n.3 (E.D. Va. 2021).

#### A. Misappropriation of Trade Secrets

As this Court has previously recognized, Virginia and federal statutes governing misappropriation of trade secrets are "nearly identical" and require that a plaintiff show: (i) that the information in question constitutes a trade secret; and (ii) that that the trade secret was misappropriated. *Apex Advanced Tech. LLC v. RMSI Private Ltd.*, 2022 WL 4286335, at *5 (E.D. Va. Sept. 30, 2022). Here, USHT asserts a claim under Virginia law, which defines a trade secret as "information, including but not limited to a formula, pattern, compilation, device, method, technique or process" that "derives independent economic value" form not being known and which is subject of efforts "to maintain its secrecy." Va. Code Ann. § 59.1-336.

Unlike the *Apex Advanced Tech* case, here, USHT concedes that the Enhanced OnePortal software does not form the basis of its trade secrets claim, because that software belongs to ACM pursuant to the ACM Contract. *See* Dkt. 25 at 9 ("U.S. HealthTek is not claiming that the software, Deliverable Items, or Contractor Background Technology that it had already turned over to ACM was a misappropriated trade secret."). The Court thus must determine what *is* the trade secret that USHT claims was misappropriated.

In its Reply Brief, USHT identifies two categories of alleged trade secret information: "(a) the highly complex documentation drafted by Breeden; and (b) the insider knowledge Negosian and Digavinti had that would enable them both to interpret the documentation and use it to complete the project." Dkt. 25 at 8. Because USHT cannot establish either that the information qualifies as a trade secret or that it was misappropriated, USHT has failed to show a likelihood of success on the merits here.

The Court first considers the second category identified: "the insider knowledge" of Negosian and Digavinti. In the same brief where USHT argues that this knowledge is protected, USHT disclaims that it is making such an argument. Dkt. 25 at 10 (arguing that their case is not built on a theory of "misappropriation by memory" or "liability for employee 'know how'"). As the Supreme Court of Virginia has recognized, information retained and "compiled solely from [employees'] memories" does not constitute misappropriation of a trade secret. *Peace v. Conway*, 246 Va. 278, 281 (1993) (finding no misappropriation of trade secrets). The Fourth Circuit, relying on *Peace*, has likewise held that an employee's "knowledge . . . was neither a trade secret nor confidential or proprietary information." *Phoenix Renovation Corp. v. Rodriguez*, 258 F. App'x

526, 538 (4th Cir. 2007).[3]  Thus, USHT has not established that any of the Defendants misappropriated a trade secret through Negosian or Digavinti.

Next, the Court examines the "highly complex documentation drafted by Breeden." Dkt. 6 at 8. It is unclear from this description whether the documentation drafted by Breeden is a single document or multiple documents and what the documentation contains. The Court specifically reviewed the declaration of USHT founder Firestone to shed more light on what documentation USHT considers a trade secret. Dkt. 25-2. That declaration did not clarify the scope of the alleged trade secrets. The Firestone Declaration describes Breeden as handling the functional specifications of the Enhanced OnePortal project and as performing most of the software testing for the product. Dkt. 25-2 ¶ 18. The Firestone Declaration then asserts that the "system documents" and software are "specifically written for [ACM] and Enhanced OnePortal," although they could also be used for other clients. *Id.* The Firestone Declaration further describes documentation, "largely drafted by Breeden," that "contained the blueprint for operating Enhanced OnePortal." Dkt. 25-2. It is again unclear to the Court how such documents, which were written specifically for ACM and which contained the blueprint for operating the Enhanced OnePortal, would not constitute the "[a]ll drawings, models, designs, formulas, methods, documents, and

---

[3] Moreover, as this Court has recently reiterated, plaintiffs who allege misappropriation of trade secrets must make more than conclusory allegations regarding what those trade secrets are. *See Am. Conservative Union, et al. v. Institute for Legislative Analysis*, 2025 WL 510236, at *7-8 (E.D. Va. Feb. 13, 2025). Although Plaintiff's label the purported trade secret here as "insider knowledge" it is not clear what that knowledge is, why it is a trade secret, and why that knowledge would not be covered under the ACM Contract as knowledge to which ACM is entitled. *See* Dkt. 6-3 (agreeing that "[a]ll drawings, models, designs, formulas, methods, documents, and tangible items *prepared for* or submitted to [ACM] by [USHT] in connection with the Services ('the Deliverable Items') shall belong exclusively to [ACM]" (emphasis added)). Thus, given the vague and conclusory allegations made by USHT regarding what constitutes its trade secrets, the Court cannot find that USHT has a reasonable likelihood of success establishing that a trade secret exists or that it has been misappropriated.

tangible items *prepared for* . . . [ACM]" and belonging "exclusively to [ACM]". Dkt. 6-3 (emphasis added). Thus, USHT has failed to establish that it had a trade secret.

Even assuming that the unspecified Breeden documentation constitutes a trade secret, USHT has not established a reasonable likelihood of success of establishing that such documentation was misappropriated. Unlike other cases considered by this Court, USHT has not adduced evidence that the documentation was downloaded, copied, or printed before Negosian's or Digavinti's departure. As USHT argued in the Reply Brief and at oral argument, its central theory with respect to misappropriation is: (i) Negosian and Digavinti "must have" unlawfully obtained that documentation; and (ii) "must have" used it to assist ACM. Dkt. 25 at 11. But this argument builds on speculative assertions that are not supported by concrete facts. *See Am. Union*, 2025 WL 510236, at *5 & *11 n. 10.[4] Moreover, as ACM noted, "Virginia does not recognize the inevitable disclosure doctrine." *Govt. Tech. Servs., Inc. v. IntelliSys Tech. Corp.*, 51 Va. Cir. 55, 1999 WL 1499548, at *1 (Va. Cir. Ct. Oct. 20, 1999); *see also Atl. Diving Supply, Inc. v. Basnight*, 2022 WL 5568083, at *6 n. 8 (E.D. Va. Sept. 21, 2022) (recognizing that Virginia does not recognize the inevitable disclosure doctrine). Accordingly, USHT has not established a likelihood of success on the merits based on misappropriation.

Because USHT has not established a likelihood of success on the merits with respect to its misappropriation of trade secrets claim, the Court need not address the remaining *Winter* factors.

B. Breach of Contract and Tortious Interference

USHT's breach of contract and tortious interference claims can be further divided into two categories: those against ACM and those against Negosian and Digavinti.

---

[4] At the hearing, USHT referred to a "theory" that Digavinti took documentation with her after Negosian left. But, against USHT referred to this as a theory and a likelihood and conceded that they do not know. Thus, again, USHT's argument in this regard is speculation.

11

i. Claim Against ACM[5]

USHT asserts that ACM has breached the ACM Contract's non-solicitation clause by working with Negosian and Digavinti. The Court accepts, for purposes of this Motion, that USHT has established a likelihood of success on the merits with respect to the breach of contract alleged against ACM. Dkt. 6-3 (prohibiting solicitation of persons who "during the term of the agreement" were employees or independent contractors of USHT). Here, it appears undisputed that ACM is working with Negosian and Digavinti on the Enhanced OnePortal project following the Individual Defendants' departure from USHT and ACM's termination of the contract with USHT.

That does not resolve the matter, however, as the ACM Contract provided for a liquidated damages provision. Dkt. 6-3 at 5 (agreeing that a breach of the non-solicitation provision "will render [ACM] liable to [USHT] for liquidated damages in the amount of Fifty thousand dollars ($50,000.00) for each individual"). This weighs heavily against a finding of irreparable harm. *See Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) ("The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm. A plaintiff must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment." (internal citations omitted)); *accord Hughes Network Sys, Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) ("Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable"). Indeed, in its Amended Complaint, USHT specifically alleged that the damages for the breach of the ACM Contract were "$150,000 for the solicitation and/or

---

[5] No tortious interference claim is asserted against ACM.

12

employment of Negosian, Digavinti, and Thomson." Dkt. 4 at 42.[6] The lack of irreparable harm is further supported by the fact that USHT terminated Negosian, considered him "disengaged" from his work, and stated that he had "serious performance issues." Dkt. 6 at 8. Furthermore, Digavinti was an independent contractor, and her contract was set to expire by December 31, 2026, thus supporting that there was no irreparable harm for her solicitation by ACM. Dkt. 6-2. Because there is a lack of irreparable harm associated with ACM's alleged breach of contract, no injunctive relief is warranted with respect to that claim.

ii. Claims Against Negosian and Digavinti

Interestingly, Negosian and Digavinti did not address the breach of contract claim against them except to the extent that it touched on the trade secrets claim. *See generally* Dkt. 19. However, USHT also alleges that Negosian and Digavinti have breached their own non-solicitation/non-compete agreements.

With respect to Negosian, he does not counter Breeden's claim that he solicited her to work with Rasck. Dkt. 6-27. Moreover, Negosian concedes that he has hired Digavinti to work for Rasck. Dkt. 19-1. He further admits that he had discussions with Digavinti regarding her unhappiness with USHT while she was still employed by USHT and discussed "if there was an opportunity to work with my new company." *Id.* Critically, Negosian does not assert that he rejected Digavinti petitions or that he informed her that he could not discuss the matter with her. Rather, Negosian casually asserts that, "[e]ventually, I hired Digavinti." *Id.* Thus, it appears that Negosian breached the non-solicitation clause of the Negosian Contract which specifically

---

[6] Although the Amended Complaint premises the breach of contract claim against ACM on the solicitation of Thomson as well, the Memorandum in support of injunctive relief does not. The Amended Complaint also premises the breach of contract claim on certain unpaid invoices and termination fees. The request for injunctive relief appropriately does not rely on those monetary damages.

13

provides: "[D]uring my employment by the Company and for one (1) year thereafter, I will not, either directly or indirectly, solicit or attempt to solicit any employee, independent contractor, or consultant of Company to terminate his, her or its relationship with Company in order to become an employee, consultant, or independent contractor to or for any other person or entity." Dkt. 6-1. From the record before the Court, it appears that Negosian directly solicited Breeden. Moreover, reading between the lines, Negosian does not deny engaging in discussion regarding employment with Digavinti while she was employed with USHT and then offering her employment later. Thus, USHT has established a likelihood of success on the merits with respect to the solicitation of its employees and independent contractors.

Furthermore, Negosian concedes that, in October 2024, he informed ACM that he could support the transition to Enhanced OnePortal and then, on November 22, 2024,[7] Rasck entered into a contract with ACM to perform upgrades to the Enhanced OnePortal system. Dkt. 19-1. It was not until after ACM and Rasck entered into this contract that ACM terminated its relationship with USHT. Dkt. 6 at 11-12 (noting that ACM terminated its relationship with USHT on November 27, 2024). The Negosian Contract provides: "[D]uring my employment by Company and for one (1) year thereafter, I will not, either directly or indirectly, either for myself or for any other person or entity, induce or attempt to induce any customer, of Company to cease doing business with Company, or in any way interfere with the relationship between any customer of Company [sic]." Dkt. 6-1. By offering to support ACM's Enhanced OnePortal project and entering into a contract with ACM while ACM was still a client of USHT, Negosian clearly "interfere[d] with the relationship" between ACM and USHT. Accordingly, USHT has shown a

---

[7] The declaration refers to November 22, 2025, but this appears to be a typographical error.

14

likelihood of success on the merits of the breach of contract claim against Negosian in this regard as well.

In Negosian's Declaration, which is submitted in support of both Negosian's and Digavinti's Opposition, Negosian admits that: (i) Digavinti was hired by Rasck; and (ii) Rasck was hired by ACM to complete the Enhanced OnePortal project. Dkt. 19-1. In a declaration and the Opposition submitted by ACM, ACM concedes that it is working with Digavinti. Dkt. 21 at 11 ("[ACM] did not start working with Negosian (or Digavinti) until November 2024"); Dkt. 21-1 at 8. The Digavinti Contract provides that Digavinti shall not "*accept business* . . . from the Company's clients or potential clients, or their assignees or successors in interest." Dkt. 6-2 at 2 (emphasis added). Here, Digavinti through her relationship with Rasck is clearly accepting business from ACM and working on the Enhanced OnePortal project. Thus, USHT has also shown a likelihood of success on the merits of its breach of contract claim against Digavinti on the breach of contract claim.[8]

The Court must next analyze whether there is irreparable harm. Here, the Court finds that there is. "[T]he Fourth Circuit has repeatedly recognized that '[t]he threat of a permanent loss of customers and the potential loss of goodwill . . . support a finding of irreparable harm." *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 517 (E.D. Va. 2021) (quoting *Update, Inc., v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018)). Judges in this District have further held that "the likelihood of irreparable harm in customer solicitation cases […] is obvious[,]" because "'[c]ustomers cannot be 'unsolicited[.]'" *Fid. Glob. Brokerage Grp., Inc. v. Gray*, 2010 WL

---

[8] Because the Court finds that an injunction is warranted based on the alleged breach of contract, the Court need not address the tortious interference and breach of fiduciary duty claims against Negosian and Digavinti. *Variable Annuity*, 535 F. Supp. 3d at 494 n.3.

4646039, at *3 (E.D. Va. Nov. 9, 2010) (quoting *Merrill Lynch v. Bradley*, 756 F.2d 1048, 1054 (4th Cir.1985)).

In a review of the balance of the equities and the public interest, the Court turns to the specific relief requested by USHT. Notably, USHT did not seek to enjoin Negosian or Digavinti from working with ACM. *See* Dkt. 5; Dkt. 5-1. In their Motion and Proposed Order, USHT sought the following relief: (i) order Defendants to discontinue use of USHT's trade secrets; (ii) order Defendants to return USHT's trade secrets; (iii) order Negosian and Digavinti not to solicit any other clients or customers; (iv) prohibit Negosian from soliciting any additional USHT employees; (v) prohibit ACM from soliciting USHT employees; and (vi) waive the security requirement. Dkt. 5. Only the third, fourth, and sixth requests apply to the breach of contract claims.[9] The third and fourth requests for injunctive relief are plainly appropriate and warranted here where, based upon the record before the Court, Negosian has solicited USHT employees and additionally where Negosian and Digavinti are performing work for a former USHT client.

Moreover, because USHT does not request that the Court enjoin Negosian and Digavinti from performing work from ACM, the injunction here will be narrowly tailored and will not result in the harm to ACM contemplated in ACM's Opposition. Dkt. 21 at 28. This comports with this Court's holding in *M Corp v. Infinitive, Inc.*, where the Court recognized that a "narrowly tailored injunction" is appropriate in these kinds of circumstances, which allows a defendant "to continue servicing its existing clients and acquiring new ones, but prohibiting it . . . from *actively* soliciting

---

[9] With respect to the sixth request, the waiver of the security requirement, USHT does not discuss why this requirement should be waived. Generally, it is not this Court's policy to waive that requirement as the Fourth Circuit has held that "a district court has discretion to set the bond amount where it deems proper, but 'it is not free to disregard the bond requirement altogether.'" *M Corp*, 2024 WL 4686132, at *9 (citing *Hoechst Diafoil Co.*, 174 F.3d at 421). Thus, as in *M Corp*, the Court will set a nominal bond here. *Id.* Here, the Court will set the bond amount at $10,000.

16

any client of Plaintiff's." 2024 WL 4697132, at *8 (E.D. Va. Nov. 6, 2024) (emphasis in original); *see also Salomon & Ludwin, LLC v. Winters,* 2024 WL 3511629, at *6 (E.D. Va. July 23, 2024) ("[A]n injunction here would not prohibit Defendants from working with Plaintiff's former clients, nor would it prohibit clients from leaving Plaintiff's firm of their own volition. It would only prevent Defendants from soliciting clients, leaving the clients free to choose who they would like to hire."). Thus, like *M Corp* and *Salomon*, an injunction here would only bar further harm to USHT by prohibiting future solicitation. Accordingly, the Court finds that the balance of the equities and the public interest weighs in favor of an injunction here.

### C. Business Conspiracy and Aiding and Abetting Breach of Fiduciary Duty

Although USHT asserts that its claim of aiding and abetting breach of fiduciary duty supports the issuance of an injunction against ACM, USHT's Memorandum only cursorily addresses aiding and abetting. Dkt. 6. To the extent the aiding and abetting claim is premised on the misappropriation of trade secrets, that claim plainly fails for the reasons discussed above. To the extent that the aiding and abetting is premised on Negosian and Digavinti's breaches of contract, there is no allegation that ACM knew the contents of their employment contracts with USHT and, based on the evidence presented, ACM did not engage to work with either Negosian or Digavinti until after their employment with USHT had ended. Dkt. 21-1 at 8 (asserting that ACM did not start working with Rasck until November 2024 and was not aware of Digavinti working with Rasck until November/December 2024). Thus, USHT has not established "actual knowledge of the underlying fiduciary duty" or "actual knowledge of the breach" by Negosian or Digavinti. *M Corp*, 2024 WL 4686132, at *5.

With respect to the business conspiracy theory, Virginia's business-conspiracy law provides for civil relief if a plaintiff establishes: "(1) a combination of two or more persons for the

17

purpose of willfully and maliciously injuring [the] plaintiff in his business; and (2) resulting damage to [the] plaintiff." *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214 (Va. 2014) (internal citation omitted); *see* Va. Code Ann. 18.2-499–500. "It is not necessary for a plaintiff to prove that the defendant conspirators acted with actual malice, *i.e.*, ill-will, hatred, or spite . . . . Rather, a plaintiff must establish . . . only that the conspirators acted with legal malice, *i.e.*, intentionally, purposely, and without lawful justification." *Dunlap*, 287 Va. at 215 (cleaned up). A cause of action for statutory business conspiracy must be based on an act that is itself wrongful or tortious, not merely a breach of contract. *See id.* at 214–18. And, like fraud, it also must be pleaded with particularity. *Danville Com. Indus. Storage, LLC v. Selective Ins. Co. of S.C.*, 2018 WL 6625078, at *4 (W.D. Va. Dec. 18, 2018) (citing *Gov't Emps. Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d, 700, 706 (E.D. Va. 2004)).

USHT primarily premises its business conspiracy claim on the alleged misappropriation of trade secrets claims, which, as discussed above, fails. Dkt. 6 at 34 ("Negosian, Digavinti, and ACM Global maliciously conspired to misappropriate U.S. HealthTek's trade secrets and thereby harm U.S. HealthTek"). So too does the business conspiracy claim. In its Reply, USHT asserts that the business conspiracy claim also rests on the alleged breaches of fiduciary duty. But, as noted, USHT has also failed to establish a likelihood of success on the aiding and abetting breach of fiduciary duty claim. Thus, USHT has not established an act that is itself wrongful or tortious, beyond merely a breach of contract. *Dunlap*, 754 S.E.2d at 317-19.

Furthermore, USHT has failed to adequately allege a conspiratorial agreement. USHT alleges a conspiracy in only the most conclusory terms. *See Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499–500 (E.D. Va. 2003) (stating a plaintiff must plead agreement in more than mere conclusory language because "a conspiracy claim asserted in

18

mere conclusory language is based on inferences that are not fairly or justly drawn from the facts alleged"); *Johnson v. Kaugars*, 14 Va. Cir. 172, 176 (Va. Cir. 1988) ("[I]t is not enough merely to state that a conspiracy took place."). Nor has USHT adequately established the willful and malicious requirement of Va. Code § 18.2-499 as it pertains to ACM. *See Mountain Area Realty, Inc. v. Wintergreen Partners, Inc.,* 2007 WL 4561293, at *5 (W.D. Va. Dec. 21, 2007) (dismissing business conspiracy claim where plaintiff had "failed to plead facts alleging malicious conduct aimed specifically at [plaintiff]" and "Complaint does not contain allegations giving rise to a reasonable inference of legal malice"). Indeed, the Supreme Court of Virginia has recognized the very motives that ACM has alleged drives it here; namely, that, when employees leave a company, "inevitably customers of the former employer will desire to continue to deal with the former employee in the new business." *Peace*, 246 Va. at 282. Accordingly, USHT has failed to establish a likelihood of success on the merits of its business conspiracy claim against ACM.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Plaintiff's Motion Preliminary Injunction and Temporary Restraining Order (Dkt. 5) is GRANTED-IN-PART and DENIED-IN-PART. The Motion is granted only as to the breach of contract claims against Negosian and Digavinti and is denied with respect to the misappropriation of trade secrets claim and all claims against ACM; and it is

FURTHER ORDERED that:

A. Negosian and Digavinti shall not attempt to induce any client or customer of U.S. HealthTek, Inc. to cease doing business with U.S. HealthTek, Inc. until after September 2025;[10]

B. Negosian shall not attempt to induce any U.S. HealthTek, Inc. employee to separate from employment with U.S. HealthTek, Inc. until after September 2025; and it is

FURTHER ORDERED that U.S. HealthTek, Inc. shall post bond in the amount of $10,000 to be paid into the Court registry pursuant to Federal Rule of Civil Procedure 65(c); and it is

FURTHER ORDERED that the Motion for Leave to File Excess Pages (Dkt. 23) is GRANTED.

It is SO ORDERED.

Alexandria, Virginia
February 28, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge

---

[10] Because the non-solicitation provisions in the Negosian and Digavinti Contracts expired after 12 months, so too does this Court's prohibition.