IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| U.S. HEALTHTEK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-130 (RDA/LRV) |
| | ) | |
| ROBERT NEGOSIAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants Robert Negosian and Kiranmayee Digavinti's Motion to Dismiss (Dkt. 44) (the "Individual MTD"),[1] Defendant ACM Global Laboratories' Motion to Dismiss (Dkt. 47) (the "ACM MTD"), and Plaintiff U.S. Healthtek, Inc.'s Motion to Supplement the Record (Dkt. 58). This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). These matters have been fully briefed and are now ripe for disposition. Considering the Motions together with the Second Amended Complaint (Dkt. 42) ("SAC"), the Memoranda in Support (Dkts. 45, 48, 59), the Oppositions (Dkts. 52, 53, 61), and the Replies (Dkts. 56, 57, 62), this Court GRANTS-IN-PART and DENIES-IN-PART the Individual MTD, GRANTS-IN-PART and DENIES-IN-PART the ACM MTD, and DENIES the Motion to Supplement for the reasons that follow.

---

[1] Negosian and Digavinti only seek to dismiss Counts I, III, IV, VI, and VIII against them. Dkt. 45.

1

# I. BACKGROUND

## A. Factual Background[2]

Plaintiff U.S. HealthTek ("USHT") is a company that provides "healthcare industry partners with information technology support in project management, custom software creation, and virtual staffing." Dkt. 42 ¶ 6. Negosian is a former employee of USHT. *Id.* ¶ 8. Digavinti formerly served as a lead software engineer for USHT. *Id.* ¶ 9. Defendant ACM Global Laboratories ("ACM") owns DrugScan, Inc. ("DrugScan") and DSI Medical, Inc. ("DSI") and has conducted business with USHT through those entities. *Id.* ¶ 11.

USHT provides and facilitates construction of highly sophisticated customized tools for clients, lab data management and translation, continuous management of clients' computer networks to ensure maximum functionality, system migration tools, and secure file transfer and messaging services. *Id.* ¶ 15. In short, USHT's software facilitates customer relations management and analyzes at a high-level the functionality of its clients' data systems while making it easier for clients to track data, issues, and resolutions. *Id.* ¶ 16.

In 2012, Negosian joined USHT, when it operated under a different name. *Id.* ¶ 18. In 2013, he became a minority shareholder and chief operating officer ("COO"). *Id.* In 2023, Chief Executive Officer Cristy Reiter promoted Negosian to the role of president. *Id.* In Negosian's role as COO and president of USHT, he had unfettered access to the company's confidential information. *Id.* ¶ 19.

---

[2] For purposes of considering the instant Motions to Dismiss, the Court accepts all facts contained within the Second Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In 2019, USHT hired Keri Thomson, Negosian's wife, to serve as an assistant to Reiter. *Id.* ¶ 20.

During this time, Negosian maintained regular and substantial contact with USHT's clients, including ACM. *Id.* ¶ 21. ACM is a company specializing in clinical trial testing services, and it is the parent company of Drug Scan and DSI. *Id.* ¶ 22. In 2014, USHT began contracting with DSI. *Id.* ¶ 23. In 2018, USHT continued working with DSI even after DSI and DrugScan were acquired by ACM. *Id.* ACM was one of USHT's most valuable customers. *Id.* ¶ 24.

Digavinti joined USHT in 2017 and initially served as a developer consultant who supported and serviced USHT's software applications. *Id.* ¶ 25. Over time, USHT promoted her to lead software engineer. *Id.* She and Negosian developed the software systems that would become a key part of USHT's service packages, including its OnePortal system. *Id.* ¶ 26.

Over the past nine years, USHT invested significant resources into developing OnePortal and the related software, HealthPortal. *Id.* ¶ 27. The OnePortal system had a positive impact on ACM's business. *Id.* ¶ 28. In 2022, ACM, through its Chief Information Officer Robert "Bob" Diamond, decided to pursue a replacement of the OnePortal system. *Id.* ¶ 29. It hired a company called I3 to develop its own version of OnePortal with certain enhancements that ACM wanted. *Id.*

In 2023, ACM concluded that I3's efforts did not meet ACM's requirements and Diamond contacted USHT. *Id.* USHT agreed to upgrade OnePortal and the resulting project was called Enhanced OnePortal. *Id.*

In December 2023, ACM granted USHT a one-year extension to finish the Enhanced OnePortal project. *Id.* ¶ 30. The project was taking longer than anticipated due to ACM's requests for new features and Negosian's unrealistic projected completion dates. *Id.* Digavinti agreed to

continue working with USHT until the Enhanced OnePortal project's anticipated completion date in December 2024. *Id.* ¶ 31.

In 2024, USHT and ACM memorialized their agreement to develop the Enhanced OnePortal project through various Statements of Work. *Id.* ¶ 32. USHT assigned six team members to the Enhanced OnePortal project for ACM, including the project's co-leaders: Barbara Breeden and Digavinti. *Id.* ¶ 33. Negosian relied heavily on Breeden and Digavinti to complete the project. *Id.*

Breeden was a USHT expert in Enhanced OnePortal functionality, and she was largely responsible for maintaining the documentation that provided the blueprint for the program, detailed the improvements that had been made, and detailed outstanding tasks. *Id.* ¶ 34. Without such documentation, which included seven categories and sixteen subcategories of information, no programmer would be able to complete the Enhanced OnePortal work without reverse engineering it – a process that would take months. *Id.* Digavinti's depth of knowledge of the product and its code were also essential to the execution of the Enhanced OnePortal project. *Id.* ¶ 35.

In the course of developing Enhanced OnePortal, USHT alleges that Negosian and Digavinti had direct access to propriety, highly confidential information belonging to USHT. *Id.* ¶ 36. Negosian, Digavinti, and Breeden had to map out complex workflows and translate it into software programming that would provide the unique solutions that ACM required to operate its system properly. *Id.* ¶ 37.

USHT alleges that its employees developed specialized knowledge specific to OnePortal and Enhanced OnePortal after more than a decade of extensive research and development. *Id.* ¶ 38. Such software support systems require exact combinations of processes to use them correctly. *Id.* USHT asserts that it takes reasonable measures to protect its confidential information,

including requiring certain employees to sign confidentiality agreements. *Id.* ¶ 39. All employees who are separated from the company also immediately lose access to the highly secure cloud on which USHT secures its information. *Id.* ¶ 40.

Negosian entered an Employee Confidential and Inventions Agreement on March 4, 2021 (the "Negosian Agreement"). *Id.* ¶ 41. Pursuant to the Negosian Agreement, Negosian agreed to the following provision:

> I hereby assign and agree to assign in the future (when any such Inventions or Intellectual Property Rights are first reduced to practice or first fixed in a tangible medium as applicable) to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights, with respect thereto) made, conceived, reduced to practice, or learned by me, either alone or with others, during the period of my employment by Company.

*Id.* (citing Dkt. 42-1 ¶ 2.3). Further, pursuant to the Negosian Agreement, Negosian agreed that, "[a]t all times during and after [his] employment," he was prohibited from disclosing or using (without the permission of USHT's CEO) any of USHT's "Confidential Information," as defined therein. *Id.* ¶ 43(a). After termination of employment, he was also required to "deliver to the Company all of the Company's property, equipment, and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information, and Confidential Information" and to certify as such in writing. *Id.* ¶ 43(b). He was also prohibited from copying, deleting, or altering any information in his USHT computer before returning it to the company. *Id.* Finally, after termination of employment, Negosian was required to provide USHT with "a computer-usable copy" of all Confidential Information that he maintained on any "personal computer, server, e-mail system . . . and then to permanently delete and expunge such Confidential Information from those systems." *Id.* ¶ 43(c).

Also in the Negosian Agreement were several noncompetition, nonsolicitation, and noninterference. *Id.* ¶ 44. Negosian was prohibited from engaging "in any employment or

business activity that is competitive with, or would otherwise conflict with [his] employment by, the Company." *Id.* ¶ 44(d). Additionally, for one year after termination, Negosian was prohibited from "directly or indirectly, solicit[ing] or attempt[ing] to solicit any employee, independent contractor, or consultant of Company to terminate his, her or its relationship with Company in order to become an employee, consultant, or independent contractor to or for any other person or entity." *Id.* ¶ 44(e). Furthermore, for one year after termination of employment, Negosian was prohibited from "either directly or indirectly, either for [himself] or for any other person or entity, induc[ing] or attempt[ing] to induce any customer, of Company to cease doing business with Company, or in any way interfere[ing] with the relationship between any customer of Company." *Id.* ¶ 44(f).

In the Negosian Agreement, Negosian acknowledged that any breach of the agreement would cause USHT irreparable harm because of the nature of his services to USHT. *Id.* ¶ 45. Negosian also agreed that any waiver or failure to enforce any provision of the Negosian Agreement on one occasion would not be deemed a waiver of the provision of the agreement. *Id.* The Negosian Agreement provided that it would be subject to the laws of Virginia and it provided that Negosian consented to personal jurisdiction in state and federal courts having jurisdiction over Prince William County, Virginia. *Id.*

On December 30, 2023, Digavinti entered into an Independent Contractor Agreement ("Digavinti Agreement") with USHT. *Id.* ¶ 51 (citing Dkt. 42-2). Pursuant to the Digavinit Agreement, she agreed that:

> All right, title, and interest in and to any and all ideas, processes, inventions (whether patentable or not), technology, original works of authorship, design, formulas, copyrights, programs, systems, data, materials, and all improvements, rights, and claims related to the foregoing conceived, produced, developed or reduced to practice by Contractor alone or with others during Contractor's performance of the Services (collectively the "Work Product"), shall  belong

> exclusively to the Company, Contractor hereby assigns and transfers to the Company, in perpetuity all of Contractor's worldwide rights, title, and interest in and to the Work Product, including, but not limited to, all inventions, whether patentable or not, copyrights, trade secret rights, and other proprietary and intellectual property rights in such Work Product.

*Id.* ¶ 53. The Digavinti Agreement also provided that she had an indefinite obligation to "keep confidential and not to disclose or make unauthorized use of information pertaining in any manner to the business of the Company or to the Company's clients." *Id.* Digavinti also agreed not to "disclose any third party reports, recommendations, conclusions, or other results of the Services or the subject matter or purposes of this Agreement without the prior consent of [USHT]." *Id.* ¶ 55. The Digavinti Agreement also precluded Digavinti, for the 12 months following termination of the agreement, from: "1) solicit[ing] or accept[ing] business (including but not limited to an offer of employment) from [USHT's] clients or potential clients, or their assignees or successors in interest; 3) induc[ing] or attempt[ing] to induce any [USHT] client or potential client or their assignees or successors in interest, to withdraw, curtail, divert, or cancel its business with [USHT], whether on behalf of [Digavinti] or any third party." *Id.* ¶ 56.

Digavinti agreed that violations of the Agreement could result in irreparable harm to USHT. *Id.* ¶ 57. She further agreed that any dispute arising under the Digavinti Agreement was subject to the exclusive jurisdiction of the state and federal courts sitting in Prince William County, Virginia. *Id.* ¶ 58.

On January 21, 2022, USHT and ACM entered into a Consulting Services Agreement ("ACM Agreement"), in which USHT agreed to provide support services for information technology project management. *Id.* ¶ 63. The ACM Agreement provided that project-specific guidelines would be dictated by Statements of Work, depending on the project. *Id.* ¶ 64. Various Statements of Work governed the Enhanced OnePortal project, including a Statement of Work that

required ACM to provide a 90-day termination notice and a $15,000 per month flat fee for USHT for services up to 100 hours per month. *Id.* ¶ 65.

The ACM Agreement required ACM to give written notice of any objection to a USHT invoice within fourteen days of receiving the invoice, and it provided that, if ACM did not object within fourteen days, it "has waived its right to object to the invoice." *Id.* ¶ 66. ACM never objected within fourteen days to any USHT invoice. *Id.* ¶ 67.

The ACM Agreement provided for three instances in which the agreement could be terminated: (1) if one of the parties breached the agreement and failed to cure the breach within thirty days; (2) upon five business days' notice from USHT to ACM that ACM failed to make payments under the contract; and (3) upon completion of the last services provided for in a Statement of Work. *Id.* ¶ 68. ACM also agreed that, for 12 months following termination of the agreement, that it would not engage in the following:

> directly or indirectly, recruit, or attempt to recruit, discuss employment with, or otherwise utilize the services of any person who, during the term of this Agreement, is an employee or independent contractor of [USHT], to perform for [ACM] any job function that is substantially related or similar to a job function provide by that individual for [USHT] in the course of [USHT's] performance under the Agreement, including any related Statement of Work.

*Id.* ¶ 69. ACM further agreed that it would be liable to USHT for liquidated damages in the amount of $50,000 for each USHT employee or independent contractor solicited by ACM. *Id.* ¶ 70.

ACM agreed that "[a]ll drawings, models, designs, formulas, methods, documents, and tangible items prepared for or submitted to [ACM] by [USHT] in connections with the Services (the 'Deliverable Items') shall belong exclusively to [ACM]." *Id.* ¶ 71. That provision including the following caveats: (a) "Deliverable Items" excluded "Contractor Background Technology," which included things like methods, algorithms, research, development, and processes that USHT created before the effective date of the ACM Agreement; and (b) to the degree USHT incorporated

8

Contractor Background Technology into the Deliverable Items, USHT granted ACM a non-exclusive license to use USHT's Contractor Background Technology for any purpose. *Id.* ¶ 71. USHT did not authorize Negosian or Digavinti to prepare or submit any Deliverable Items to ACM after they separated from employment with USHT. *Id.* ¶ 72. ACM agreed that the ACM Agreement would be governed by the laws of Virginia. *Id.* ¶ 73.

In August 2023, Reiter discovered that Negosian had made "exorbitant personal charges" on USHT's credit card without reimbursing USHT. *Id.* ¶ 74. Reiter confronted Negosian and instructed him to stop, but he did not do so. *Id.*

USHT alleges, upon information and belief, that in January 2024, Negosian began laying the groundwork for the establishment of Rasck Consulting ("Rasck"), a company that would directly compete with USHT. *Id.* ¶ 75.

On May 6, 2024, Reiter learned that Negosian had booked a cruise for his family, including Thomson, and that he had scheduled the cruise for dates on which Negosian knew it was essential for Thomson to be working. *Id.* ¶ 76. When Reiter confronted Negosian, Negosian said, "I'm done," and refused to speak to Reiter for six days. *Id.* Unbeknownst to USHT, on May 17, 2024, Negosian published the website for Rasck and, on June 27, 2024, an attorney registered Rasck with the California Secretary of State's Office on Negosian's behalf. *Id.* ¶ 77.

Later, Reiter discovered that Negosian had used his USHT credit card to purchase plane tickets for his extended family to attend his daughter's graduation and to purchase plane tickets for his family's European Disney cruise. *Id.* ¶ 78. After conducting a review of Negosian's use of his USHT credit card, Reiter realized that from 2022 to 2024, Negosian made at least $250,000 in unauthorized purchases without reimbursing USHT. *Id.*

On July 5, 2024, USHT terminated the employment of Thomson; and, on July 12, 2024, USHT founder Bryan Firestone told Negosian that his employment with USHT would be ending soon. *Id.* ¶ 79. Firestone also instructed Negosian to stop contacting any USHT clients. *Id.* USHT alleges that Negosian began marketing himself to USHT's customers while employed with USHT. *Id.* ¶ 80 (citing Dkt. 19-1).

USHT was not concerned about Negosian's exit from the Enhanced OnePortal project, because Negosian was incapable of executing his ideas without help from specialists like Breeden or Digavinti. *Id.* ¶ 81. USHT alleges that Negosian was dependent on Digavinti's knowledge of the software code and dependent on Breeden's knowledge of the Enhanced OnePortal documentation. *Id.*

USHT alleges, "[o]n information and belief," that, while employed by USHT, Negosian removed and retained USHT data with the intent of using it to divert USHT clients to Rasck. *Id.* ¶ 82.

On August 9, 2024, Negosian contacted Breeden via Microsoft Teams to ask her to call him. *Id.* ¶ 83. During the conversation, they discussed the status of the Enhanced OnePortal project, and Negosian mentioned that he might start a consulting firm. *Id.* Negosian also mentioned the high degree of talent at USHT and said that, if he was going to take any USHT employee with him, Breeden would be his first choice. *Id.* He told Breeden that he wanted to stay in contact with her. *Id.* Breeden considered his overture inappropriate. *Id.*

On August 12, 2024, Firestone met with DrugScan Director of Finance and Billing, Tony Damico, to discuss Negosian's transition away from USHT. *Id.* ¶ 84. Firestone assured Damico that, thanks to team members like Digavinti and Breeden, USHT remained fully capable of finishing the Enhanced OnePortal project and it would not be stalled by Negosian's exit. *Id.*

On August 13, 2024, DrugScan General Manager Scott LaNeve emailed Firestone and Reiter the following:

> I hope you guys are well. I just wanted you to know that we have discussed Robert's leaving [USHT] and we are happy to have [USHT's] continued support. While there were some immediate concerns voiced within DSI, Tony Damico told me he spoke to you last night and feels really good about your continued support for One Portal. I reinforced my position with Tony, 'We hired [USHT], not Robert. Employees come and go from every organization. We hired [USHT] so we would not have to worry about one engineer here or there. I trust Bryan and Cristy. If Bryan and Cristy gave you their assurances, we are good.' Tony agreed with me 100%.

*Id.* ¶ 85.

That same day, Negosian responded to an email sent by ACM employee Travis Schaefer in which Schaefer followed up on a July 16, 2024 email to which Negosian had earlier failed to respond. *Id.* ¶ 86. In the July email, Schaefer had inquired about certain design changes with Enhanced One Portal. *Id.* In Negosian's response, he asked Schaefer to "have Jason give me a call" and indicated that it was regarding "[s]omething I want to discuss with him before moving forward." *Id.* ¶ 87. Negosian copied on his email DrugScan Director of Laboratory Information Systems, Jason Lichti. *Id.* USHT alleges that Negosian's purpose in asking Lichti to call him was to engage in marketing for Rasck. *Id.* ¶ 88. During the call, Negosian told Lichti that the existing USHT development team could assist ACM with the work. *Id.* ¶ 89. Lichti responded by suggesting that ACM could hire Negosian's new company to do contract work after Negosian left USHT. *Id.*

Later that day, Lichti sent an email to Diamond calling for an "internal conversation" about Enhanced OnePortal and the impact of Negosian's departure. *Id.* ¶ 90. USHT alleges, upon information and belief, that Lichti spoke with Diamond and advocated for ACM to terminate its contract with USHT and contract with Negosian to complete the Enhanced OnePortal project. *Id.*

11

USHT further alleges, upon information and belief, that Negosian engaged in additional conversations with ACM personnel between August 13, 2024, and September 1, 2024, to encourage ACM to terminate ACM's contract with USHT and work with Rasck instead. *Id.* ¶ 91. USHT also alleges, upon information and belief, that Negosian assured one or more ACM employees between August 14 and September 1, 2024, that he would make efforts to recruit Digavinti and/or Breeden to join Rasck. *Id.* ¶ 92.

On August 30, 2024, Reiter terminated Negosian's employment. *Id.* ¶ 93. In a termination letter, Reiter wrote that Negosian was being terminated for: (i) his repeated personal charges on the USHT credit card; (ii) his negative attitude and unsupportive behavior; (iii) his careless oversight of timekeeping applications; (iv) his inability to implement basic project tracking; and (v) his poor performance on a project. *Id.* She also noted that Negosian was in violation of his USHT shareholder agreement. *Id.* ¶ 94. Reiter informed Negosian that he was permitted to keep his USHT laptop and that she was not concerned about there being confidential information on it, because all USHT data was maintained on a highly secure cloud. *Id.* ¶ 95. Negosian's access to the cloud was immediately cut off upon his termination. *Id.* USHT alleges, upon information and belief, that Negosian kept information on his laptop falling within the categories of protected information as described in the Negosian Agreement. *Id.* ¶ 96.

During Negosian's employment with USHT and after, Negosian discussed with Digavinti the possibility of her resigning from her position with USHT and joining Rasck. *Id.* ¶ 97.

On September 9, 2024, USHT was shocked when Digavinti submitted her resignation. *Id.* ¶ 98. Digavinti stated that September 30, 2024, would be her last day of employment. *Id.* Digavinti cited the following reasons for her resignation: (i) it had become "increasingly difficult for [her] to manage multiple jobs"; (ii) she needed to be employed by a United Kingdom-based

employer to maintain her work visa status in the United Kingdom; and (iii) the extension deadline for USHT to finish the Enhanced OnePortal project for ACM made further delay to her resignation impossible. *Id.* USHT alleges that Digavinti's true motivation for leaving USHT was to join Negosian at Rasck to complete the Enhanced OnePortal project for ACM. *Id.* ¶ 99. USHT further alleges, upon information and belief, that Digavinti knew that ACM would not terminate its contract with USHT and work with Rasck unless she also joined Rasck. *Id.* ¶ 100. USHT also alleges, upon information and belief, that Negosian offered Digavinti higher compensation to complete the Enhanced OnePortal project for Rasck. *Id.* ¶ 101.

USHT alleges that, in September 2024, ACM and Negosian "continued negotiations" for Rasck to replace USHT on the Enhanced OnePortal project. *Id.* ¶ 102. During those negotiations, Negosian told ACM that he did not possess all of the necessary documentation or source code for Enhanced OnePortal. *Id.* USHT alleges, upon information and belief, that Negosian was not speaking truthfully when he told ACM that he did not have the necessary documentation, because USHT believes that Negosian downloaded it without USHT authorization and took it with him. *Id.* ¶ 103.

In September 2024, Digavinti agreed to provide part-time assistance to USHT with the Enhanced OnePortal project until October 31, 2024. *Id.* ¶ 104.

On September 24, 2024, Damico emailed various ACM employees, including Diamond, and openly floated the idea of using Negosian, rather than USHT to complete the Enhanced OnePortal project. *Id.* ¶ 105.

On September 30, 2024, Diamond sent an email to a group of representatives from both USHT and ACM, requesting a meeting "to discuss recent concerns related to [USHT's] ability to support finalization" of the Enhanced OnePortal project. *Id.* ¶ 106. USHT found the request odd

given that the project was running smoothly. *Id.* USHT alleges, upon information and belief, that Diamond's email reflects that he has been in contact with that he had been in communication with Negosian and that Diamond was laying the groundwork for terminating ACM's contract with USHT. *Id.*

On October 1, 2024, at 10:50 a.m. Damico emailed Reiter on behalf of ACM and asked: "Is [Digavinit] still employed by [USHT]? Her not being on calls the last few days is concerning to the team and we are putting 2 and 2 together." *Id.* ¶ 107. USHT was surprised by this email, because, to its knowledge, Digavinti had not been absent during any calls in the month of September and USHT had not yet shared the news of her recent resignation. *Id.*

Around 1:00 p.m. that same day, Damico spoke by telephone to Firestone who told him that Digavinti would be working with USHT part-time due to a visa issue, and Firestone assured Damico that USHT had all technology matrices and personnel necessary to complete the work. *Id.* ¶ 108.

At 1:44 p.m. that same day, Damico emailed several ACM employees, including Diamond and Senior Vice President Joseph Whelan. *Id.* ¶ 109. Damico reported what Firestone had told him, including that Digavinti was still working for USHT part time. *Id.* Whelan responded: "This is deceitful. Kiran in [sic] no longer associated with USHT and [sic] currently unemployed. There is [sic] no visa complications." *Id.* Whelan said the "two primary developers" of Enhanced OnePortal had always been Negosian and Digavinti, and "[s]omeone should immediately communicate with Robert Negosian to arrange a successor plan for completion and future support of this project by the two primary developers responsible." *Id.*

USHT alleges, upon information and belief, on October 1, 2024, ACM personnel complied with Whelan's director and began coordinating with Negosian to replace USHT as the provider who completed the Enhanced OnePortal project. *Id.* ¶ 110.

USHT asserts that Digavinti was coordinating with Negosian in October 2024 but did not tell USHT and maintained the necessary security clearance that gave her access to all information related to the Enhanced OnePortal project. *Id.* ¶ 111. USHT alleges, upon information and belief, that while working for USHT in October 2024, Digavinti provided USHT's information to Negosian regarding the development of Enhanced OnePortal and assisted him in preparing Rasck to take on the project. *Id.* ¶ 112.

On October 31, 2024, at 1:21 p.m., Damico emailed Negosian at his Rasck email address and said, "Hi Robert, We are in the middle of a project and we are unhappy with our current vendor, [USHT]. Would you be interested in helping finish development and rolling it out to our clients?" *Id.* ¶ 113. USHT alleges, upon information and belief, that this email was pretextual and was written to create a paper trail to make it appear that negotiations with Negosian had just begun on October 31, 2024. *Id.*

On October 31, 2024, at 7:21 p.m., Negosian emailed Reiter and explained that he understood that Reiter had implied that she would be terminating his position as an officer in her letter of August 30, 2024, but that he was formally resigning from his position as a director and officer of USHT, effective immediately. *Id.* ¶ 114.

On information and belief, after Digavinti completed her part-time employment with USHT on October 31, 2024, she immediately thereafter began working full time for Rasck. *Id.* ¶ 115.

15

On November 27, 2024, Diamond emailed Firestone. *Id.* ¶ 116. In this email, Diamond explained that ACM was "moving in a different direction." *Id.* He also announced that ACM would be dissolving all active agreements, asked that USHT stop all work immediately, said that ACM was removing all USHT staff members' access to product domains, and requested the seven categories and sixteen subcategories of documentation related to Enhanced OnePortal. *Id.*

On December 3, 2024, Firestone emailed Diamond and noted, among other things, that a 90-day termination notification was required for the Statement of Work related to the Enhanced OnePortal project and ACM was therefore being invoiced $45,000. *Id.* ¶ 117. Firestone said that he would not provide the requested documentation unless ACM paid the $45,000 as well as other outstanding invoices. *Id.* Firestone also reminded ACM that, under the ACM Agreement, ACM was prohibited from using the services of any USHT employee to perform substantially similar job functions. *Id.*

On December 3, 2024, Lichti inadvertently emailed Negosian's USHT email address. *Id.* ¶ 118. In the email, Lichti stated: "Robert, Congratulations on starting your own company. I did call Bob after we spoke initially and I'm glad to see us going directly to you. Bob seems to think you're very capable and he's not easy to impress. Welcome!" *Id.* Shortly after Lichti sent the email, he unsuccessfully attempted to recall it. *Id.* USHT alleges, upon information and belief, that the Bob referred to in the email is Diamond. *Id.* ¶ 119. USHT further alleges, upon information and belief, that the call referenced was a reference to the call between Lichti and Negosian shortly after their August 13, 2024 email. *Id.* ¶ 120.

USHT alleges, upon information and belief, that Negosian downloaded the necessary documentation to complete Enhanced OnePortal without authorization. *Id.* ¶ 121. USHT further alleges, upon information and belief, that Digavinti downloaded the documentation necessary to

complete Enhanced OnePortal without authorization. *Id.* ¶ 122. USHT alleges, upon information and belief, Negosian and Digavincit used USHT's documentation to complete the project without USHT's authorization and that otherwise they could not have completed the project. *Id.* ¶ 123.

On January 7, 2025, Diamond responded to Firestone's email of December 3. *Id.* ¶ 124. Diamond refused to pay the 90-day termination fee, claiming the costs of the Enhanced OnePortal project were excessive and, with respect solicitation of former USHT employees, Diamond replied: "Not applicable." *Id.*

USHT alleges that, not counting the $45,000 early termination fee, ACM has still failed to pay USHT $124,500 in outstanding invoices, despite receiving and not objecting to such invoices. *Id.* ¶ 125.

USHT alleges, upon information and belief, that before Negosian, Digavinti, and Thomson lost access to USHT's systems, they deleted hundreds of emails. *Id.* ¶ 126. Specifically, USHT alleges that Negosian's USHT inbox had a subfolder dedicated to ACM and, on information and belief, he deleted every email therein. *Id.* USHT further alleges, upon information and belief, that the emails deleted by Negosian, Digavinti, and Thomson contained evidence of their coordinated efforts to undermine USHT. *Id.* ¶ 127. USHT asserts that it has been able to recover some emails, but not all. *Id.*

USHT alleges, upon information and belief, that Negosian and Digavinti used alternative means of communicating to discuss their plans to divert USHT business to Rasck. *Id.* ¶ 128.

On December 11, 2024, counsel for USHT sent a letter to Diamond demanding that ACM stop using the services of Negosian and Digavinti, but no one from USHT responded. *Id.* ¶ 131.

On December 27, 2024, USHT counsel sent a letter to Negosian demanding that he cease and desist from all activities in violation of the Negosian Agreement and immediately return all

trade secrets and confidential information. *Id.* ¶ 132. The letter also reminded Negosian that the Negosian Agreement precluded Negosian from working for ACM. *Id.* Counsel for Negosian responded on January 2, 2025, refusing to return any USHT devices, because they were given to Negosian and/or Thomson and that they had reformatted the computers to remove any USHT information. *Id.*

On January 9, 2025, USHT counsel sent a letter to Digavinti reminding her of her obligations under the Digavinti Agreement. *Id.* ¶ 134.

USHT alleges, upon information and belief, that Negosian has attempted to solicit other USHT clients and employees. *Id.* ¶¶ 135-36.

### B. Procedural Background

USHT filed its Complaint on January 23, 2025. Dkt. 1. On February 6, 2025, USHT filed its Amended Complaint. Dkt. 4. That same day it filed a motion for a preliminary injunction and temporary restraining order. Dkt. 5. On February 26, 2025, oral argument was heard regarding the motion. Dkt. 27. On February 28, 2026, the Court issued a Memorandum Opinion and Order which granted in part and denied in part the motion. Dkt. 29.

On March 17, 2025, USHT filed its Second Amended Complaint. Dkt. 42. On March 31, 2025, the Defendants filed the pending Motions to Dismiss. Dkts. 44, 47. On April 14, 2025, USHT filed its Oppositions. Dkts. 52, 53. On April 21, 2025, Defendants filed their Replies. Dkts. 55, 56, 57.

On May 7, 2025, USHT filed its Motion to Supplement. Dkt. 58. On May 21, 2025, ACM filed its Opposition. Dkt. 61. On May 27, 2025, USHT filed its Reply. Dkt. 62.

### II. STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a

complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

### III. ANALYSIS

USHT has asserted twelve counts against the various Defendants: (i) Count I, breach of contract (Negosian); (ii) Count II, breach of contract (Digavinti); (iii) Count III, breach of covenant of good faith and fair dealing (Negosian and Digavinti); (iv) Count IV, breach of fiduciary duty (Negosian and Digavinti); (v) Count V, tortious interference with contractual relations (Negosian and Digavinti); (vi) Count VI, tortious interference with business expectancy (Negosian and Digavinti); (vii) Count VII, tortious interference with contractual relations (Negosian); (viii) Count VIII, tortious interference with business expectancy (Negosian); (ix) Count IX, unjust enrichment

(Negosian); (x) Count X, breach of contract (ACM); (xi) Count XI, breach of covenant of good faith and fair dealing (ACM); and (xii) Count XII, aiding and abetting breach of fiduciary duty (ACM). ACM seeks to dismiss each of the three counts against it. Dkt. 48. Negosian and Digavinti seek to dismiss Counts I, III, IV, VI, and VIII against them. Dkt. 45. Because the analysis of ACM's claim may depend on whether USHT has stated a claim against Negosian and Digavinti, the Court will first analyze the arguments raised in the Individual MTD.

As a preliminary matter, however, the Court will address USHT's Motion to Supplement as it may also drive the analysis of the Second Amended Complaint.

### A. Motion to Supplement

Here, USHT seeks to supplement the "record" with declarations from other employees that USHT asserts were solicited by ACM. Dkt. 59. In support, USHT cites an out-of-circuit decision from the U.S. District Court from the District of Columbia, wherein the court permitted a *defendant* to supplement the record in support of a *Rule 12(b)(1)* motion to demonstrate that certain aspects of the complaint were moot. *See Marsh v. Johnson*, 263 F. Supp. 2d 49, 53 (D.D.C. 2003). In so doing, USHT recognizes that there is a difference between supplementing a "pleading" which must be done pursuant to Rule 15 and a motion.

USHT's argument is not well taken. In consideration of a Rule 12(b)(6) motion to dismiss, there is no "record" to be considered, there is only the operative complaint and the briefing. And, in seeking to provide further facts outside of the complaint to address an argument raised in a motion to dismiss, USHT seeks to amend its Second Amended Complaint without complying with Rule 15.[3] As district judges in this Circuit uniformly recognize, it is axiomatic that [a] complaint

---

[3] To the extent that USHT argues that ACM improperly sought to rely on matters outside of the pleadings in support of its motion to dismiss, the correct solution is not for the Court to supplement the "record," but for the Court not to consider factual matters outside of the Second

may not be amended by the briefs in opposition to a motion to dismiss." *Arnett v. Hodges L. Off., PLLC*, 2019 WL 4195343, at *4 (E.D. Va. Sept. 4, 2019) (quoting *Mylan Labs, Inc. v. Akzo, N. V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991)). Thus, the Motion to Supplement will be denied as it improperly seeks to amend and add facts to the Second Amended Complaint.

### B.  Count I – Breach of Contract

Count I is based on an alleged breach of the Negosian Agreement. USHT alleges that Negosian breached the nonsolicitation, noncompetition, noninterference, and confidentiality provisions of the Negosian Agreement.  Dkt. 42 ¶¶ 137-150.  Negosian argues that California law should apply to the Negosian Agreement and that, under California law, the noncompete and nonsolicitation breach of contract claims fail.  Dkt. 45.

A federal court sitting in diversity applies the forum state's choice-of-law rules to determine the substantive state law that governs the plaintiff's claims. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Virginia adheres to the use of traditional rules applicable to conflicts of laws," *Frye v. Commonwealth*, 231 Va. 370 (1986), including "the traditional conflicts principle that the 'nature, validity and interpretation of contracts are governed by the law of the place where made, unless the contrary appears to be the express intention of the parties.'" *Crosson v. Conlee*, 745 F.2d 896, 902 (4th Cir. 1984) (quoting *Woodson v. Celina Mut. Ins. Co.*, 211 Va. 423 (Va. 1970)).  Moreover, "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances." *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citing *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999)).  Such an unusual circumstance includes when a

---

Amended Complaint.  The Court will keep this argument in mind as it considers ACM's Motion to Dismiss.

"foreign law not only differs from Virginia law but is contrary to compelling public policy of the *Commonwealth*; in that case, Virginia courts will not lend their aid to enforce the obligation under foreign law." *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021) (emphasis added).

Here, Negosian concedes that, pursuant to the Negosian Agreement, he agreed that any disputes should apply Virginia law. Dkt. 45 at 6; Dkt. 42-1. Analysis of the question of which law governs the Negosian Agreement properly begins by focusing on the language the parties used in the provision, as the Supreme Court of Virginia has taught that "the true test for the determination of the proper law of a contract is the intent of the parties." *Tate v. Hain*, 181 Va. 402, 410 (1943). And, because contracting parties express their intention "in the words they have used," courts must examine those words to ascertain the parties' intent. *W.F. Magann Corp. v. Virginia–Carolina Elec. Works, Inc.*, 203 Va. 259, 264 (1962). The specific provision in the Negosian Agreement states: "This Policy and any action related thereto will be governed and interpreted by and under the laws of the Commonwealth of Virginia, without giving effect to any conflicts of laws principles that require the application of the law of a different state." Dkt. 42-1 ¶ 8.1. By use of the term "governed" it is clear that the parties intended the choice of law provision to apply broadly. *See Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F. Supp. 3d 462, 467 (E.D. Va. 2016). This supports that Virginia law should apply.

Furthermore, as USHT notes, this Court has previously held that under federal law, "a forum-selection clause is prima facie valid and should be enforced unless enforcement is unreasonable under the circumstances." *Apex Advanced Tech. LLC v. RMSI Priv. Ltd.*, 2022 WL 4826335, at *4 (E.D. Va. Sept. 30, 2022) (citing *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 213 (4th Cir. 2007)). To determine whether a forum selection cause is reasonable, a court may consider several factors, including whether: "(1) the clause's formation was induced by fraud

or over-reaching; (2) the complaining party 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) the clause's enforcement would contravene a strong public policy of the forum state." *Id.* Negosian does not suggest that any of the first three elements apply. And Virginia's public policy, as the forum state, would not be offended by applying Virginia law. Thus, these considerations also favor the application of Virginia law.

Negosian relies primarily on a decision by the Court of Appeals of Virginia declining to apply Virginia law in favor of the law of the Virgin Islands. *See Black v. Powers*, 48 Va. App. 113 (2006). There, the Court of Appeals sensibly recognized that: "*unless the parties clearly intended for the prenuptial agreement to be governed by the laws of a specific jurisdiction*, the validity of that agreement—as with any other contract—is governed by the jurisdiction where the agreement was executed, unless the substantive law of that jurisdiction is contrary to the established public policy of the Commonwealth." *Id.* at 127 (emphasis added). Here, of course, the applicable provision is clear that the parties intended Virginia law to govern. Dkt. 42-1 ("This Policy and any action related thereto will be *governed* and *interpreted* by and under the laws of the Commonwealth of Virginia" (emphasis added)). Thus, applying the Court of Appeals' decision in *Black* to the provision at issue in this case, it appears that the Court of Appeals would also determine that Virginia law applies.

Negosian's other arguments are purely policy-based[4] or based on facts not before the Court. Specifically, Negosian argues that the Negosian Agreement was executed in California and that it

---

[4] Such policy-based arguments are already subsumed within the choice of law analysis. Furthermore, the Court notes that courts frequently apply choice of law principles to litigation where applying such results would be against the public policy of one of the available states and

was intended to be performed in California.  But there are no such facts in the Second Amended Complaint, which merely asserts that Negosian is currently a resident of California.  Dkt. 42 ¶ 8. Nor does Negosian's prior declaration, submitted with respect to the prior injunction and incorporated into the Second Amended Complaint, reflect where the Negosian Agreement was signed or performed.  Dkt. 19-1.  Nor does the Negosian Agreement itself reflect where it was signed.  Dkt. 42-1.  Negosian also relies upon a First Circuit decision, *DraftKings Inc. v. Hermalyn*, 118 F.4th 416 (1st Cir. 2024).  But, in that case the First Circuit affirmed the application of Massachusetts law – rather than California law.  *Id.* at 420.  Moreover, the district and appellate court in that case both appeared to have a much more developed record regarding the work performed by the defendant.  *Id.* at 421 (discussing the number of times that the defendant travelled to Massachusetts).  In any event, here USHT also alleges that Negosian "regularly conducts business in Virginia."  Dkt. 42 ¶ 8.  Accordingly, for purposes of the Individual MTD, Virginia law applies to the Negosian Agreement.

Because Negosian's only arguments in support of dismissing Count I are premised on California law, Dkt. 45 at 10, the Individual MTD will be denied with respect to Count I.

### B. Count III – Breach of Covenant of Good Faith and Fair Dealing

The Fourth Circuit, which binds this Court, has held that, "[i]n Virginia, every contract contains an implied covenant of good faith and fair dealing."  *Wolf v. Fed. Nat. Mortg. Ass'n*, 512 F. App'x 336, 345 (4th Cir. 2013).  District judges in this District have further rejected Negosian's

---

where applying a choice of law or forum selection clause would result in individuals of small means being hailed into a faraway court.  *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991) (enforcing a forum selection clause on the back of a cruise line ticket that required passengers from Washington State to litigate their claims in Florida).

and Digavinti's argument that "Virginia law does not recognize an implied covenant of good faith and fair dealing for contracts not governed by the Uniform Commercial Code." *GW Acquisition Co., LLC Pageland Ltd. Liab. Co. v. MagLandBroker, LLC*, 2023 WL 125018, at \*14 (E.D. Va. Jan. 6, 2023), *aff'd sub nom. GW Acquisition Co., LLC v. Pageland Ltd. Liab. Co.*, 2025 WL 1625447 (4th Cir. June 9, 2025). As those cases recognize, "a claim for breach of the implied duty of good faith and fair dealing must be brought as part of a claim for breach of contract, not as an independent tort claim." *Id.* at \*15. As this Court has previously recognized, because it must be brought as part of a breach of contract claim, the "[b]reach of the implied duty of good faith and fair dealing is not a standalone claim available to Plaintiff, but is instead better viewed as an element of another cause of action at law—that is, breach of contract. *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 2022 WL 992734, at \*3 (E.D. Va. Mar. 31, 2022). Thus, USHT "may pursue this theory as a component of its breach of contract claim, but the separate count alleging Defendant breached the implied covenant of good faith and fair dealing is dismissed." *Id.* Accordingly, the Individual MTD will be granted with respect to Count III.[5]

### C. Count IV – Breach of Fiduciary Duty[6]

Digavinti seeks to dismiss Count IV, the breach of fiduciary claim against here, on the basis that she was an independent contractor – not an employee. Dkt. 45 at 12. "[A]n employee owes the employer a duty of loyalty and faithful service which, of course, is a central tenet of the employment relationship." *Laughlin v. Metro. Wash. Airports Auth.*, 952 F. Supp. 1129, 1137

---

[5] Even if a claim for a breach of good faith and fair dealing was appropriately asserted as a standalone claim, the claim here would still be dismissed because USHT simply repackages its breach of contract claim with conclusory labels.

[6] Individual MTD refers to both Counts IV and VI as involving a breach of fiduciary duty but only Count IV involves an alleged breach of fiduciary duty.

(E.D. Va. 1997). A fiduciary duty can arise from an employer-employee relationship or an agency relationship. *See Horne v. Holley*, 167 Va. 234, 241 (1936) (holding that "the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer [and] is duty bound not to act adversely to the interest of his employer"). Agency is a "fiduciary relationship resulting from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to act." *Giordano ex rel. Est. of Brennan v. Atria Assisted Living, Virginia Beach, L.L.C.*, 429 F. Supp. 2d 732, 736 (E.D. Va. 2006).[7]

Here, the Digavinti Agreement is titled "Independent Contractor Agreement" and expressly disclaims any agency relationship. Dkt. 42-2 ¶ 1.4 ("Nothing in this Agreement or in the performance of this Agreement shall imply a joint venture, partnership or principal and agent relationship between the parties."). USHT does not explain how there is consent to an agency relationship where both parties have specifically disclaimed that such a relationship existed. *See Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 695 (E.D. Va. 1990) (finding no fiduciary relationship where the parties "adduced no facts to show that the parties intended to create a fiduciary relationship"). Moreover, Digavinti did not have the characteristics of persons that courts in Virginia have recognized are associated with those having an agency or employee relationship. She did not receive benefits. *Contrast* Dkt. 42-2 ("Contractor agrees that neither Contractor nor any of Contractor's employees are eligible for or entitled to any benefits or incentives the Company provides to its employees such as, without limitation, health, disability or life insurance benefits,

---

[7] USHT also discusses principles of "apparent agency," but apparent agency is for purposes of reliance by a third party – not the parties alleged to be the principal and agent. *See Sanchez v. Medicorp Health System*, 270 Va. 299, 304 (2005). Such references are of limited usefulness here.

stock options, stock purchase plans, retirement plans or any other benefit or incentive."), *with Aksoy v. In Stock Today Cabinets, LLC*, 2024 WL 1624690, at *7 (Va. Ct. App. Apr. 16, 2024) (finding individual was "at minimum, as an agent" where "IST paid Aksoy a salary and IST provided him with employee benefits, such as health insurance, and he was given work resources by IST, including a cell phone, laptop, software, business cards, and a company car"). Importantly, the Second Amended Complaint does not even allege an agency relationship.

Courts should resist the urge to turn a "garden variety, arm's length . . . transaction" into a fiduciary relationship. *Diaz Vicente v. Obenauer*, 736 F.Supp. 679, 695 (E.D.Va.1990). That is what USHT seeks to do here. USHT did not treat Digavinti as an employee or agent, as evidenced by the Digavinti Agreement. USHT is a sophisticated entity and now seeks to rewrite the Digavinti Agreement to doubly benefit USHT – it need not treat Digavinti as an agent but gets to impose duties of loyalty on her. USHT argues that it exercised a level of control over Digavinti that transformed her into an agent; not so. To begin with, confidentiality provisions are common across contractual relationships and do not create an agency relationship. This is most clearly evidenced by the fact that the ACM Agreement contains similar confidentiality and nonsolicitation provisions. *Compare* Dkt. 42-2, *with* Dkt. 42-3. Moreover, although USHT argues that Digavinti was required to comply with USHT policies, this is too broad a reading of the Digavinti Agreement. It provides that, "*while working on the premises of the Company*," Digaviniti was required to observe three limited policies regarding access to USHT's premises or property, health and safety, and equal employment opportunity and unlawful harassment. Dkt. 42-2 ¶ 1.2. Additionally, the agreement did not require that Digavinti work certain hours, only that she "be available" during regular business hours. *Id.* ¶ 1.1. Importantly, when it came to the performance of her services, the Digavinti Agreement is clear that she retained control: "Contractor shall retain

the right to determine the manner and method in which the Services are performed. When necessary, Contractor will provide Contractor's own tools, equipment, and supplies for purposes of performing services." *Id.* Ultimately, there is no clear agreement – by either party – that Digavinti was an agent of USHT, especially where both disclaimed such a relationship.

In short, USHT has not alleged nor established an agency relationship between Digavinti and USHT, and USHT does not claim that Digavinti was an employee. In the absence of such a relationship Digavinti had no fiduciary duty and so could not breach it. Accordingly, the Individual MTD will be granted with respect to Count IV.

### D. Count VI – Tortious Interference with Business Expectancy

The parties generally agree on the five elements necessary to establish tortious interference with business expectancy: (i) the plaintiff had a contract expectancy; (ii) the defendant knew of the expectancy; (iii) the defendant interfered with the expectancy; (iv) the defendant used improper means or methods to interference with the expectancy; and (v) the plaintiff suffered damages. Dkt. 45 at 14 (citing cases); Dkt. 53 at 15 (citing cases). Defendants argue that USHT has failed to adequately allege that USHT had an expectancy in a continued relationship with ACM or that Defendants engaged in improper means to interfere.

With respect to the expectancy, a plaintiff must plead a "particular expectancy," and "it must be reasonably certain that absent the defendant's misconduct, the plaintiff would have realized the expectancy." *Cox v. MAG Mut. Ins. Co.*, 2015 WL 1640513, at *5 (E.D. Va. Apr. 9, 2015). "The evidence of an expectancy must establish expectancy by and between two parties at least, based upon something that is a concrete move in that direction." *Moore v. United Int'l Investigative Services, Inc.*, 209 F. Supp. 2d 611, 619–20 (E.D. Va. 2002). Here, USHT relies on its existing relationship to establish its expectancy in a continuing relationship. Dkt. 53. But

"[n]umerous Virginia cases have held that a mere course of dealing or the holding of a contract terminable at will (or a renewable contract) does not constitute a sufficient basis for the imposition of liability on a tortious interference claim." *Rogers Elec. of Virginia, Ltd. v. Sims*, 93 Va. Cir. 484, 2015 WL 13589667, at *5 (2015). As Defendants correctly note, "mere proof of a plaintiff's belief and hope that a business relationship will continue is inadequate to sustain" a claim for tortious interference with business expectancy." *Commercial Bus. Sys. v. Halifax Corp.*, 253 Va. 292, 301 (1997).

Here, USHT has not plausibly alleged a business expectancy. To begin with, it is difficult to see how USHT can rely on its long business relationship with ACM, when ACM had already attempted to hire a different entity to complete the Enhanced OnePortal project. Dkt. 42 ¶ 29 (noting that ACM hired I3). Moreover, the Second Amended Complaint incorporates by reference the declaration of Diamond. *Id.* ¶ 90 (citing Dkt. 21-1). In his declaration, Diamond asserts, under penalty of perjury, ACM was upset with USHT's delays and that it had concerns that USHT was not being honest. Dkt. 21-1 ¶¶ 27-33. Furthermore, USHT alleges that, in December 2023, it obtained an extension on the Enhanced OnePortal project. Dkt. 42 ¶ 30. But USHT does not allege that in the lead up to the anticipated end to the completion of the Enhanced OnePortal project that there were any negotiations taking place, that there were more projects on which ACM wanted USHT to work, or that there were any discussions of future business. Thus, USHT has not plausibly alleged a business expectancy.

Seeking to avoid this conclusion, USHT cites *NorthStar Aviation, LLC v. Alberto*, 332 F. Supp. 3d 1007 (E.D. Va. 2018), and *Darton Env't, Inc. v. FJUVO Collections, LLC*, 332 F. Supp. 3d 1022, 1034 (W.D. Va. 2018). It is clear that USHT does not intend to rely on *NorthStar*, in which the tortious interference claim was dismissed, but rather *CaterCorp, Inc. v. Catering*

*Concepts, Inc.*, 246 Va. 22 (1993), which is cited in *NorthStar*. But, in reading *CaterCorp*, it is clear that the Supreme Court of Virginia based its decision there on existing "valid contractual relationships" and *not* a business expectancy. 246 Va. at 27 ("In the first count, plaintiff seeks compensatory and punitive damages for tortious interference with valid contractual relationships, *i.e.*, the Settlement Agreement, the Employment Agreement, and plaintiff's relationships with its customers."). Similarly, USHT's reliance on *Darton* is perplexing given that the *Darton* Court also dismissed the tortious interference claim. 332 F. Supp. 3d at 1034. More particularly, the *Darton* Court found an allegation of a continued expectancy in receiving refined oil from the defendant to be insufficient to satisfy the plaintiff's burden. *Id.* Accordingly, the Individual MTD will be granted with respect to Count VI.[8]

E. Count VIII – Tortious Interference with Business Expectancy

In the second tortious interference claim that USHT asserts, USHT alleges that Negosian tortiously interfered with its expected business with Digavinti when he recruited her to Rasck. Dkt. 42 ¶ 199. Defendants rest their argument in favor of dismissal here on whether there was a plausible expectancy. Dkt. 45 at 16. In this regard, Defendants note again that Digavinti was an independent contractor and that the Digavinti Agreement was terminable at will by either party. Dkt. 42-2 ¶ 2.1 Defendants further note that USHT has incorporated by reference Negosian's declaration into the Second Amended Complaint. Dkt. 42 ¶ 80 (citing Dkt. 19-1). In Negosian's declaration, he noted that Digavinti was unhappy working for USHT and looking for a way out. Dkt. 19-1 ¶ 16. USHT alleges much the same, namely that Digavinti with her work at USHT.

---

[8] For the same reasons discussed in the Court's prior Memorandum Opinion and Order regarding the injunction, Negosian and Digavinti's arguments regarding improper methods are not well taken. *See* Dkt. 29 at 13-15.

Dkt. 42 ¶ 98. USHT's arguments regarding the prospect of a continuing business relationship – beyond the Digavinti Agreement[9] – are vague and conclusory. Nothing in the Second Amended Complaint suggests a reasonable certainty that USHT's relationship with Digavinti would continue. *Rogers Elec.*, 93 Va. Cir. 484, 2015 WL 13589667, at *5 (2015) (recognizing that "[n]umerous Virginia cases have held that a mere course of dealing or the holding of a contract terminable at will (or a renewable contract) does not constitute a sufficient basis for the imposition of liability on a tortious interference claim"). Accordingly, the Individual MTD will be granted with respect to Count VIII.

*    *    *

In short, the Individual MTD will be granted with respect to Counts III, IV, VI, and VIII. The Individual MTD will be denied with respect to Count I.

F.  Count X – Breach of Contract

ACM first seeks to dismiss Count X, the breach of contract claim asserted against it. Dkt. 48 at 10. The parties do not dispute that the essential elements of a breach of contract claim are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *White v. Trans Union LLC*, 2025 WL 409660, at *4 (E.D. Va. Feb. 5, 2025) (citing *NAC Consulting, LLC v. 3Advance, LLC*, 650 F. Supp. 3d 441, 447 (E.D. Va. 2023)).

Here, USHT's breach of contract claim is premised on three distinct alleged breaches: (1)

---

[9] Negosian and Digavinit do not seek to dismiss the tortious interference with contract claims. Thus, USHT's argument that Negosian "interfered with an existing contract . . . is enough to ensure that U.S. HealthTek's claim survives dismissal," is not well taken. Dkt. 53 at 18. That argument would be appropriate had Negosian sought to dismiss Count VII – which asserts tortious interference with the Digavinti Agreement – but he has not. And the existence of a contract alone does not suggest the likelihood of a future contract.

breach of the ACM Agreement's termination provision (Dkt. 42 ¶ 221)); (2) failure to pay invoices (*id.* ¶¶ 218-219)); and (3) breach of the ACM Agreement's employee nonsolicitation provision (*id.* ¶ 220). The Court will analyze each alleged breach separately.

*First*, USHT alleges that ACM's termination of the ACM Agreement was a breach that resulted in $1,000,000 in damages. Dkt. 42 ¶ 221. ACM argues that USHT accepted ACM's cancellation such that there can be no termination. Dkt. 48 at 10. USHT disagrees and argues that there was no meeting of the minds with respect to cancellation because USHT agreed to accept cancellation with contingencies that ACM refused to accept. Dkt. 52 at 7-8. This dispute regarding a meeting of the minds on rescission or termination is more properly made at a later stage of the case, after discovery, rather than a parsing of the words in two emails. *See A.C. Furniture, Inc. v. Arby's Restaurant Grp., Inc.*, 2014 WL 4961055, at *4 (W.D. Va. Oct. 3, 2014) (denying motion to dismiss and recognizing that whether there was "an intention manifested in that e-mail" may be a question for a jury).[10] Accordingly, the ACM MTD will be denied in this regard.

*Second*, USHT alleges that ACM has failed to pay invoices. Dkt. 42 ¶¶ 214-215. The Court agrees that the Second Amended Complaint fails to plead any specific facts regarding the alleged invoices. Thus, the Court cannot determine from the Second Amended Complaint which invoices remain outstanding, pursuant to which Statement of Work, and the dates on which the invoice was sent and the date on which the time to object expired. Accordingly, USHT has failed to plausibly allege a breach of contract with respect to the invoices for work alleged to have been performed. With respect to the $45,000 owed for a breach of the 90-day termination period, USHT

---

[10] The emails cited by ACM are not as clear as ACM argues them to be. For example, ACM relies on an email from Firestone where he confirms that "Time and Material *services* are terminated per notice provided on 11/27/2024." Dkt. 21-1 at 33 (emphasis added); Dkt. 55 at 12 (citing same). But stopping services is different from assenting to the termination of the ACM Agreement without reservation.

has alleged sufficient facts to state a plausible breach of contract claim. USHT alleges that the Statements of Work provided for a 90-day termination period and also provided that there was a $15,000 a month minimum payment. Dkt. 42 ¶¶ 65, 117, 125, 214. USHT has further alleged that ACM did not pay the subsequent invoice for this amount. *Id.* ¶ 214. This is sufficient. Moreover, in the materials relied upon by ACM (and incorporated into the Second Amended Complaint), Diamond conceded that there is a "90-day notice" required. Dkt. 21-1 at 30.[11] Accordingly, the ACM MTD will be granted in part and denied in part with respect to the issue of outstanding invoices.

*Finally*, USHT alleges that ACM breached the ACM Agreement by soliciting Negosian, Digavinti, and other USHT employees to perform work for ACM. Dkt. ¶ 217. Importantly, USHT does not identify the "other" employees. Accordingly, USHT has failed to state a plausible claim with respect to those persons. With respect to Negosian and Digavinti, this Court already determined that USHT had established a likelihood of success on this breach of contract claim. Dkt. 29 at 12. And no injunction issued with respect to this claim only because of the liquidated damages provision within the nonsolicitation provision. *Id.* Implicit in the likelihood of success on the merits determination is a determination that USHT plausibly stated a claim. At this time, the Court is unpersuaded by ACM's arguments that it should change its view regarding this provision. Accordingly, the ACM MTD is granted in part and denied in part with respect to the breach of the nonsolicitation provision.

---

[11] ACM makes an argument that USHT breached first and thus it is not entitled to payment of invoices. The Court does not rely on or consider this argument because it was made in a footnote in Reply. Dkt. 55 at 1 n.1. The Fourth Circuit "warn[s] against ruling on a 'minimally addressed' issue based on arguments only raised in a footnote, as it is 'unfair' to the opposing party 'and would risk an improvident or ill-advised opinion on the legal issues raised." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 278 (4th Cir. 2022).

In short, Count X will be dismissed to the extent it attempts to rely on alleged invoices for unpaid work or solicitation of "other" employees outside of Negosian and Digavinti. The ACM MTD will otherwise be denied with respect to this Count.

### G. Count XI – Breach of Covenant of Good Faith and Fair Dealing

ACM seeks to dismiss Count XI, which asserts a breach of the covenant of good faith and fair dealing, for largely the same reasons that the Individual Defendants sought to dismiss Count III. As this Court noted *supra*, this Court has previously held that the "[b]reach of the implied duty of good faith and fair dealing is not a standalone claim available to Plaintiff, but is instead better viewed as an element of another cause of action at law—that is, breach of contract." *Brainchild Surgical Devices, LLC*, 2022 WL 992734, at *3. Thus, USHT "may pursue this theory as a component of its breach of contract claim, but the separate count alleging Defendant breached the implied covenant of good faith and fair dealing is dismissed." *Id.* Accordingly, the ACM MTD will be granted with respect to Count XI.

### H. Count XII – Aiding and Abetting Breach of Fiduciary Duty

As an initial matter, the parties first dispute whether Virginia law even recognizes a cause of action for aiding and abetting a breach of fiduciary duty. The Court need not resolve that dispute at this point because, assuming that such a cause of action exists, ACM has failed to adequately allege such aiding and abetting. Assuming without deciding that such a cause of action exists, the elements of such a claim include ACM's "(1) actual knowledge of the underlying fiduciary duty and (2) actual knowledge of the breach of that fiduciary duty by the primary tortfeasor." *M Corp v. Infinitive, Inc.*, 2024 WL 4696132, at *5 (E.D. Va. Nov. 6, 2024) (quoting *Best Medical Intern., Inc. v. Wittmer*, 73 Va. Cir. 504 at *2 (2007)).

In its Opposition, USHT identifies five ways in which ACM is alleged to have "participated in and encouraged Negosian's breach." Dkt. 52 at 19. With respect to those five asserted encouragements of a breach of fiduciary duty, USHT fails to establish either that ACM knew that Negosian's actions would constitute a breach or that they were a breach *by Negosian* at all.

- First, USHT argues that ACM aided the breach by recruiting Negosian while he was still employed by USHT. *Id.* But USHT fails to assert why recruiting Negosian to leave USHT qualifies as a breach of Negosian's fiduciary duty. The Supreme Court of Virginia has held that, "in the absence of a contract restriction regarding the duty of loyalty, an employee has the right to make arrangements during his employment to compete with his employer after resigning his post." *Williams v. Dominion Tech. P'ners, LLC*, 265 Va. 280, 289 (2003). The Fourth Circuit has similarly acknowledged, applying Maryland law, that an employee can "prepare or make arrangements to compete" without breaching a duty of fiduciary duty. *Crawford & Co. v. M. Hayes & Assocs., LLC*, 13 F. App'x 174 (4th Cir. 2001) (per curiam).[12] USHT does not plausibly allege that ACM had any knowledge of the terms of the Negosian Agreement.

- Second, USHT similarly argues that ACM aided and abetted a breach when it "encouraged [Negosian] to compete." Dkt. 52 at 19. This is simply a repackaging of the first alleged encouragement, and it fails for the same reason.

- Third, USHT asserts that ACM "violat[ed] its own agreements by hiring Negosian and Digavinti." *Id.* But this does not reflect encouragement of any breach *by Negosian*, who is the one that has the fiduciary duty.

- Fourth, USHT asserts that ACM hid from USHT that it had poached USHT employees. *Id.* Again, this does not reflect encouragement of any breach *by Negosian*.

- Fifth, USHT argues that ACM hid from USHT that former employees were using USHT's confidential information. *Id.* This Court previously warned USHT that its allegations regarding use of confidential information were speculative. Dkt. 29 at 11, 17. The Second Amended Complaint does not cure the deficiencies previously noted. Each of the allegations regarding use of confidential information are made "on information and belief." Dkt. 42 ¶¶ 82, 96, 237. Moreover, USHT expressly alleges that Negosian told ACM that he did not have the confidential information. *Id.* ¶ 102. Although USHT alleges, again on information and belief, that Negosian was being untruthful, *id.* ¶ 103, USHT does not plausibly allege that ACM knew he was being untruthful or that ACM knew that he was

---

[12] *See also Cont. Assocs., Inc. v. Atalay*, 2015 WL 1649051, at *4 (E.D. Va. Apr. 10, 2015) ("[I]n light of Virginia's tolerance of 'rough-and-tumble conduct in the employment marketplace,' the Court finds and concludes as a matter of law that Defendants' pre-resignation conduct does not rise to the level of establishing a breach of their fiduciary duties under Virginia law.").

using USHT's confidential information.    Additionally, the specific confidential information that Negosian had or used or downloaded is not identified, although presumably USHT intended to refer to the unspecified "seven categories and sixteen subcategories of Enhanced OnePortal documentation that were maintained by Breeden." *Id.* ¶ 102.    It remains unclear to this Court, from the vague description of this documentation, whether the Breeden documentation would constitute documents prepared for ACM and belonging to ACM. Dkt. 29 at 10-11.

In sum, USHT has failed to establish that ACM aided and abetted any breach of fiduciary duty by Negosian, and Count XII will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the Individual MTD (Dkt. 44) is GRANTED-IN-PART and DENIED-IN-PART.  The Motion is granted with respect to Counts III, IV, VI, and VIII and denied with respect to Count I; and it is

FURTHER ORDERED that the ACM MTD (Dkt. 47) is GRANTED-IN-PART and DENIED-IN-PART.  The Motion is granted with respect to Counts XI, and XII and with respect to portions of Count X.  The Motion is denied with respect to portions of Count X; and it is

FURTHER ORDERED that the Motion to Supplement (Dkt. 58) is DENIED; and it is

FURTHER ORDERED that, if USHT desires to further amend its complaint, it is DIRECTED to file a motion for leave to amend on or before March 20, 2026, because, although it is not clear that further amendment would be futile, the Second Amended Complaint represents USHT's third attempt to successfully plead each of its claims.

It is SO ORDERED.

Alexandria, Virginia
February 25, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge